# United States Tax Court

SCOTT A. BLUM AND AUDREY R. BLUM,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

———————

Docket No. 5313-16.                    Filed February 18, 2025.

———————

*Susan E. Seabrook, James N. Mastracchio, Karol Kurzatkowski, Nicholas S. Netland*, and *Christopher S. Cruz*, for petitioners.

*Lori Katrine Shelton, K. Lyn Hillman, Brandon M. Chavez, Najja O. Bullock*, and *Lesley A. Hale*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, *Judge*: This affected items case deals primarily with the responsibility of taxpayers and the Internal Revenue Service (IRS) to update information about the partners of a partnership under the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71. The Treasury regulations[1] explicitly and clearly state the requirements for partnerships and their partners to update names and addresses of the partners as well as the IRS's obligations when mailing a notice of Final Partnership Administrative Adjustment (FPAA).

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Dollar amounts are rounded.

**[*2]**   Petitioners did not adhere to the regulations; the IRS did. Petitioners did not properly identify Scott Blum as an indirect partner in the TEFRA partnership or update the address for sending the FPAA with respect to his partnership interest. Instead, they try to place the blame for their alleged nonreceipt of the FPAA on the revenue agent (RA) who audited their personal and partnership returns.

Petitioners do this because they want to avoid a district court's decision in the TEFRA partnership case that held that Mr. Blum engaged in a tax shelter and improperly deducted a $78.5 million artificial loss (tax shelter loss). They knew about the partnership case while it was ongoing in district court and are obviously unhappy with the outcome. We find not only that the IRS mailed the required FPAA with respect to Mr. Blum's partnership interest to the correct address but also that petitioners received it.

Throughout this case, petitioners have concocted numerous unfounded theories about the IRS's alleged failure to follow proper procedure. They have also made multiple misrepresentations to the Court and omitted important information. Testimony by IRS employees clearly and credibly establishes that the IRS indeed followed proper procedures and that the IRS mailed the FPAA as required by the Code and the regulations.

Apart from their argument about their alleged nonreceipt of the FPAA, petitioners also make multiple baseless arguments to avoid paying the tax that they owe pursuant to the district court's decision. They argue that the district court did not really disallow the tax shelter loss and that they resolved the disallowance of the $78.5 million tax shelter loss in a prior Tax Court case for a mere $373,641 in tax. They also challenge the timeliness of the FPAA and the affected items Notices of Deficiency that precipitated the filing of the Petition. Each of these arguments fails. Accordingly, we find, in accordance with the district court's decision in the TEFRA case, that petitioners are not entitled to deduct the $78.5 million tax shelter loss.

Respondent also determined section 6662(h) penalties for gross valuation misstatements for 1999, 2007, and 2010, and a section 6651(a)(1) addition to tax for failure to file a return timely for 2007. We dismiss the section 6662(h) penalties for lack of jurisdiction and hold that petitioners are liable for the section 6651(a)(1) addition to tax for 2007.

[*3]                          FINDINGS OF FACT

The following facts are derived from the pleadings, Stipulations of Facts with attached Exhibits, and the testimony and Exhibits admitted into evidence at trial. Neither petitioner testified. When petitioners timely filed the Petition, they resided in Wyoming.

We granted numerous continuances so the parties could pursue discovery.[2] Unfortunately, these proceedings have been marked with a contentious discovery process that included petitioners' demands for irrelevant documents from 62 unrelated tax shelter cases and for documents that witnesses credibly testified do not exist.[3] Petitioners argue that respondent gave evasive and incomplete responses to their discovery requests, wrongfully withheld or redacted documents, did not adequately search for requested documents, refused to produce documents, and made implausible claims that documents do not exist. We reviewed documents in camera and disagreed with these claims. We find that respondent cooperated with petitioners' legitimate discovery requests but was hampered not only by the fact that most documents were created approximately 20 years ago but also by California's COVID stay-at-home orders. We are satisfied that respondent searched for the requested documents thoroughly and in good faith and produced all relevant documents.

I.    *Mr. Blum's Investment in a Tax Shelter*

During 1999 Mr. Blum engaged in the Bond Linked Issue Premium Structure (BLIPS) tax shelter through Democrat Strategic Investment Fund, LLC (DSIF), a TEFRA partnership for federal tax purposes. Mr. Blum was not a member of DSIF. Rather, he held his interest in DSIF through Bogan Ventures, LLC (Bogan), a single-member limited liability company (LLC) that was a disregarded entity

---

[2] Petitioners informed the Court that they filed a complaint in district court on October 29, 2024, under the Freedom of Information Act for documents relating to the TEFRA partnership, Mr. Blum's partnership interest, and the mailing of the FPAA. The record in this case closed on the last day of trial. Petitioners had ample time for discovery before trial.

[3] For example, petitioners sought files from an IRS office in Sacramento, California, but witness testimony credibly establishes that the office did not retain the files after the partnership-level case was docketed in district court. Petitioners also alleged that respondent improperly removed and withheld files from a file cabinet used by an IRS employee, but the employee credibly testified that she did not use the file cabinet.

[*4] for federal tax purposes. Mr. Blum was an indirect partner of DSIF. *See* § 6231(a)(10) (defining an indirect partner).

Bogan owned approximately 90% of DSIF although its percentage interest is not clear from the record. Two entities related to the tax shelter promoter, Presidio Growth, LLC (Presidio Growth), and Presidio Resources, LLC (Presidio Resources), owned the remaining interests. Presidio Growth was DSIF's tax matters partner (TMP).

The strategy of the BLIPS tax shelter was to inflate Bogan's outside basis in DSIF, and then have DSIF liquidate and distribute its assets (DSIF assets) to Bogan. Petitioners carried over Bogan's inflated outside basis in DSIF as the total basis in the distributed DSIF assets. Mr. Blum had Bogan sell the DSIF assets for prices lower than the assets' inflated bases to generate $78.5 million in artificial tax loss.

As a disregarded entity, Bogan did not file a return for 1999. Petitioners timely filed a personal return for 1999 and reported that their address was in Monarch Beach, California (Monarch Beach address). They claimed a $78.5 million tax shelter loss from the sale of the DSIF assets on Schedule D, Capital Gains and Losses. They deducted the $78.5 million tax shelter loss to avoid paying tax on approximately $74.8 million of gain from their sale of an unrelated asset. They reported that they had no taxable income for 1999. They carried forward part of the tax shelter loss and deducted it for 2007 and 2010. They also reported Bogan's income and expenses on their 1999 return.

Around April 17, 2000, DSIF timely filed a partnership return for a short tax year of August 23 to December 22, 1999 (1999 taxable year). DSIF's return included Schedule K–1, Partner's Share of Income, Deductions, Credits, etc., for Bogan. Bogan's Schedule K–1 showed Bogan's taxpayer identification number (TIN). It did not indicate that Bogan was a single-member LLC, that it was a disregarded entity for federal tax purposes, that Mr. Blum was Bogan's sole member, or that Mr. Blum was DSIF's indirect member. Nor did any other part of DSIF's partnership return disclose this information. Mr. Blum's name was not on Bogan's Schedule K–1 or any other part of DSIF's return. Schedule K–1 showed that Bogan's address was on Brookline Avenue in Aliso Viejo, California (Schedule K–1 address). On the basis of Schedule K–1, Bogan was a notice partner of DSIF and was entitled to receive a copy of the FPAA (notice partner FPAA). *See* § 6231(a)(8) (defining notice partner).

**[\*5]**  Bogan's Schedule K–1 did not specify its percentage ownership in DSIF. Schedules K–1 for DSIF's three members showed their profit and loss percentages and their percentage ownership of capital as "various." According to Schedules K–1, Bogan contributed approximately 89.5% of the capital, was allocated between 94.9% and 99.4% of income, loss, and deductions, and received 72.3% of the cash distributions. DSIF's LLC agreement is not in the record. In February 2001 Mr. Blum dissolved Bogan.

II.  *Audit of Petitioners' 1999 Return*

On September 5, 2000, the IRS issued I.R.S. Notice 2000-44, 2000-2 C.B. 255, advising taxpayers that it determined that Son-of-Boss tax shelters, including the BLIPS tax shelter, were not bona fide and did not reflect actual economic consequences.

In October 2001 the IRS began an audit of petitioners' 1998 return. During 1998 Mr. Blum engaged in the Offshore Portfolio Investment Strategy (OPIS) tax shelter through a trust. RA Joni Politzer was assigned to the audit. In February 2002 the IRS expanded the audit to include petitioners' 1999 and 2000 returns and in May 2002 DSIF's 1999 return.

In early 2002 petitioners moved to Wyoming. In March 2002 RA Politzer sent certified mail to petitioners at the Monarch Beach address that the U.S. Postal Service (USPS) returned to the IRS as unclaimed. On July 3, 2002, the IRS mailed a notice of beginning of partnership administrative proceeding (NBAP) for DSIF's 1999 taxable year to its TMP. The NBAP asked the TMP to update the name and address of each partner for DSIF's 1999 taxable year if the TMP discovered that previously provided information was incorrect or incomplete. Respondent has been unable to find a copy of an NBAP addressed to Bogan.[4]

In May 2004 Mr. Blum told RA Politzer that petitioners had moved to Jackson, Wyoming, in February 2002 and that the address of their residence in Jackson was on East Hansen Avenue (East Hansen

---

[4] Respondent asserts that he mailed a copy of the NBAP to Bogan at the Schedule K–1 address on November 5, 2002, which petitioners dispute. We do not need to decide whether the IRS mailed a copy of the NBAP to Bogan because the failure to mail a copy of the NBAP to a notice partner does not affect the outcome of this case. *See Goldberg v. Commissioner*, T.C. Memo. 2021-119, at \*17, *aff'd*, 73 F.4th 537 (7th Cir. 2023).

[*6] address).[5] Shortly thereafter, on May 17, 2004, RA Politzer mailed correspondence to each petitioner at the East Hansen address. The USPS stamped the envelopes with a two-line stamp "No Street Delivery" "Box # Required" and returned them to RA Politzer. By fax dated May 24, 2004, RA Politzer told petitioners' attorney Jeffrey Helfer that the USPS had returned mail addressed to the East Hansen address and requested petitioners' "correct mailing address."[6] By email on June 17, 2004, Mr. Helfer provided a post office box address for petitioners. No street address was provided with the post office box address. Mr. Helfer's email did not include any other information such as Bogan's name, Mr. Blum's sole ownership of Bogan, DSIF's name, or Mr. Blum's identity as an indirect member of DSIF. Later that month RA Politzer mailed duplicate copies of correspondence to petitioners at the Monarch Beach and the post office box addresses.

On June 22, 2004, RA Politzer asked Mr. Helfer to provide "a street address where overnight/UPS mail can be delivered." There is no evidence in the record that Mr. Helfer responded to this request. In a July 6, 2004, fax to Mr. Helfer, RA Politzer requested petitioners' "correct street address." She wrote that "I have made several requests for a current address for taxpayers (most recently on 6/22/04). However, you provided me only with a post office box address . . . Please provide me with a correct street address." The fax also included an information document request that showed the post office box address. On the same date, July 6, 2004, petitioners executed Form 872, Consent to Extend the Time to Assess Tax, for 2000 and listed two addresses: the East Hansen address, which was labeled their "current" address, and the Monarch Beach address, which was labeled their "per return" address.

In an email on July 14, 2004, Mr. Helfer told RA Politzer that petitioners' "home address" was the East Hansen address. During July 2004 RA Politzer mailed correspondence to each petitioner and Bogan in the care of Mr. Blum at the post office box address. RA Politzer and RA Theresa Alvarez mailed notices of third-party summonses (summons notices) to each petitioner and Bogan at the post office box address. *See* § 7609 (requiring the IRS to mail a summons notice to a taxpayer's last known address). The USPS returned the summons notices addressed to Bogan and Mrs. Blum to the IRS as unclaimed. On August 4, 2004, RA

---

[5] Some documents in the record spell the street name as "Hanson."

[6] On May 19, 2004, petitioners filed Form 2848, Power of Attorney and Declaration of Representative, appointing Mr. Helfer as their representative, which stated petitioners' address was in Woodland Hills, California.

[*7] Politzer faxed an information document request to Mr. Helfer that showed the post office box address for petitioners.

None of Mr. Helfer's communications to RA Politzer or any other communications from petitioners to RA Politzer or the IRS stated that the USPS did not deliver mail to the East Hansen address or that a post office box was required for the USPS to deliver mail to petitioners in Jackson, Wyoming. RA Politzer updated the address box on her case activity record for petitioners as follows:

Scott A. & Audrey R. Blum
xxx E. Hanson [sic] (7_14_2004 per Helfer)
Jackson, WY 83001

P.O. Box xxx (6_22_2004 per Helfer)
Jackson, WY 83001

A case activity record is part of an RA's personal workpapers of the audit and is used to document contemporaneously all actions that the RA and the taxpayer take during an audit. Internal Revenue Manual (IRM) 4.10.9.3.1 (May 14, 1999).

The IRS's FINDSD transcript for petitioners shows that they continued to use the Monarch Beach address on their returns even after they moved to Wyoming in 2002, including on a return that they filed in 2005. They first used the East Hansen address on a return that they filed in 2008 and then switched to using a different street address in Jackson.[7] They did not use the post office box address on any personal returns that they filed during this period. The instructions for Form 1040, U.S. Individual Income Tax Return, direct taxpayers to enter a box number instead of the taxpayer's street address only if the post office does not deliver mail to the taxpayer's home.

A. *Freeze on BLIPS Audits*

On February 20, 2004, the IRS issued an internal memorandum directing its personnel to temporarily halt "outside interactions" with respect to Son-of-Boss tax shelters, including the BLIPS tax shelter, because of ongoing criminal investigations. According to the memorandum, RAs were permitted "to continue to develop [their] cases based on information already in [their] possession." Thereafter, in late

---

[7] A FINDSD transcript provides a taxpayer's name and address in the IRS Integrated Data Retrieval System (IDRS). *See* IRM 4.71.2.3 (Nov. 12, 2021).

[*8] February 2004 IRS officials met with attorneys from the U.S. Department of Justice's (DOJ) U.S. Attorney's Office who participated in the criminal investigations to discuss protocols for the IRS to resume audits while minimizing any potential impact on the criminal investigations. The criminal investigations involved individuals who designed, promoted, and implemented the BLIPS tax shelter. There is no evidence in the record that Mr. Blum was under criminal investigation. The IRS and the DOJ exchanged memoranda of understanding to establish protocols under which RAs would continue the audits. The IRS agreed to a 120-day freeze on activities that would "precipitate a resolution . . . for less than 100% of the tax due and owing."

On March 8, 2004, after agreeing to the audit protocols, the IRS issued a second internal memorandum that placed a 120-day freeze (halt memo) on "discussions of any potential resolutions" regarding any Notice 2000-44 issue and further directed RAs to make "no attempt to resolve an audit issue or dispute." In the halt memo the IRS instructed RAs not to comment or to indicate any IRS position. However, RAs could continue certain aspects of their audits including requesting and obtaining documents, analyzing their cases, and listening to taxpayers' views of the transactions. The halt memo directed RAs to solicit extensions of the limitations period and to consult RA Robert Gee, the team manager for the BLIPS audits, when a partnership or investor refused to consent to an extension. When a limitations period was set to expire, RA Gee coordinated with Peter Alvarado, a special agent in the IRS's Criminal Investigation Division (CI) for approval to issue an FPAA or a Notice of Deficiency.

B.    *Freeze Code*

After issuing the halt memo, the IRS recorded transaction code (TC) 914 on the accounts of taxpayers who engaged in the BLIPS tax shelter (BLIPS investors). TCs are used to maintain a history of actions relating to a taxpayer's account. IRM 21.2.1.2.4 (Jan. 4, 2012). TC 914 alerts an RA who is assigned to an audit that there is a criminal investigation. IRM Ex. 4.4.1-1 (May 19, 2009). The IRS recorded TC 914 on petitioners' account for 1999 on March 18, 2004. The IRS briefly lifted TC 914 from petitioners' account on July 19, 2004, and reimposed it on September 1, 2004.[8] The IRS permanently lifted TC 914 from

_____

[8] Neither party explained why the IRS briefly lifted TC 914 from petitioners' account for approximately six weeks in summer 2004. The temporary lift coincides with the IRS's settlement initiative. As discussed below, the IRS removed TC 914 from

**[\*9]** petitioners' 1999 account on February 17, 2009, following the December 2008 convictions of two promoters of the BLIPS tax shelter.

When TC 914 is on a taxpayer's account, IRS procedure requires an RA to contact CI before proceeding with an audit, and CI instructs the RA on how to proceed with the audit. *See* IRM Ex. 4.4.1-1. CI may instruct the RA to discontinue work on the audit or allow the audit to proceed within some constraints. Typically, the RA retains responsibility for monitoring the period of limitations and requesting extensions from the taxpayer although CI sometimes assumes that responsibility. In cases where the RA is responsible for monitoring the period of limitations, IRS procedure instructs the RA to contact CI for permission to issue an FPAA or a Notice of Deficiency if the limitations period is set to expire.

TC 914 on a taxpayer's account does not prevent the IRS from issuing an FPAA or a Notice of Deficiency. Accordingly, TC 914 does not have to be lifted from a taxpayer's account for the IRS to issue either notice. However, TC 914 prevents the IRS from assessing tax. Accordingly, the IRS must lift TC 914 if the taxpayer and the IRS reach an agreement on the amount of tax owed so that the IRS may assess the tax. Otherwise, the IRS lifts TC 914 after the relevant criminal matter is resolved.

Because of the large number of taxpayers who invested in BLIPS tax shelters, the IRS issued nationwide guidance to RAs through the halt memo in addition to placing TC 914 on taxpayer accounts. As stated above, the halt memo centralized communications between IRS Examinations (Exams) and CI through RA Gee rather than have RAs assigned to BLIPS audits contact CI directly for instruction on how to proceed with the BLIPS audits and for approval to issue an FPAA or a Notice of Deficiency.

According to RA Politzer's case activity record, she asked RA Gee about TC 914's impact on issuing an FPAA for DSIF and a Notice of Deficiency to petitioners. RA Gee received permission from CI to issue an FPAA dated December 17, 2004, for DSIF's 1999 taxable year and a Notice of Deficiency dated November 10, 2005, to petitioners, discussed further below, before their issuance. He conveyed CI's approval to RA Politzer.

---

taxpayers who participated in the settlement initiative. However, petitioners chose not to participate.

**[\*10]** C.    *Settlement Initiative*

In May 2004, before the halt memo's 120-day freeze ended, the IRS announced a settlement initiative for investors in Son-of-Boss tax shelters including BLIPS investors. *See* I.R.S. Announcement 2004-46, 2004-1 C.B. 964. The settlement initiative required investors to pay 100% of the tax resulting from the disallowance of the tax shelter losses plus interest but reduced applicable penalties. Investors had until June 21, 2004, to accept the settlement by mailing a completed Notice of Election (Election) to an IRS address provided in the Announcement. They were also required to provide a copy of the Election to the examining RA. *Id.* § 4(a), 2004-1 C.B. at 965. There is no evidence in the record that petitioners, Bogan, or DSIF filed an Election.

BLIPS investors who filed Elections entered into closing agreements with the IRS that contained specific wording drafted for purposes of the settlement initiative, some of which was set forth in Announcement 2004-46. The closing agreements were generally executed in 2004 and 2005. Once a BLIPS investor entered into a closing agreement, the IRS lifted TC 914 and assessed the tax. However, for investors who did not accept the settlement initiative, TC 914 remained in place. Petitioners did not file an Election to accept the settlement initiative. Accordingly, TC 914 remained on their 1999 account, except for six weeks during summer 2004, until shortly after the criminal cases against the promoters were resolved.

III.    *Issuance of FPAA*

In late 2004 DSIF's TMP declined to extend DSIF's limitations period for 1999 beyond December 31, 2004, and petitioners had not extended the limitations period with respect to BLIPS tax shelter adjustments for their personal years under audit. In summer 2004 RA Politzer began to prepare an FPAA. She was aware that CI approval was required before an FPAA could be issued and asked RA Gee about the approval. In late November 2004 RA Gee obtained approval from CI to issue an FPAA for DSIF's 1999 taxable year and other unagreed BLIPS cases with limitations periods set to expire at yearend 2004. By email dated November 24, 2004, RA Gee informed RA Politzer and other RAs who were auditing returns of other unagreed BLIPS investors that CI "had given clearance" to issue the FPAA and that "[a]ny prior directions to hold on the case have now been released."

**[\*11]** On December 2, 2004, RA Politzer forwarded a proposed FPAA for DSIF to the Office of Chief Counsel (Chief Counsel) for approval as required by the IRM. She informed Chief Counsel that CI had not yet authorized issuance of a Notice of Deficiency to petitioners, writing under a heading "SNOD" "None – pending CI authorization to issue." After Chief Counsel approved the proposed FPAA, the audit team provided the wording and computations for the FPAA to the IRS's Technical Services Unit (TSU), in Sacramento, California (Sacramento TSU), which prepared, addressed, and mailed the FPAA. TSU is part of Exams. Sacramento TSU issued the FPAAs for the unagreed BLIPS tax shelter cases that had limitations periods set to expire at yearend 2004, including DSIF's FPAA.

Because of the urgency caused by the yearend period of limitations, Sacramento TSU prepared the FPAAs to the TMPs and notice partners for the unagreed BLIPS cases (BLIPS FPAAs) at the same time.[9] Working as a team, the RAs in TSU reviewed the wording and computations of the BLIPS FPAAs for accuracy and confirmed that the limitations periods were open. A clerk in TSU searched the Partnership Control System (PCS) and IDRS for TMPs' and notice partners' addresses. *See* IRM 4.29.5.1(1) (Jan. 1, 2003). These databases enable the entire IRS to access the IRS's activity with respect to taxpayer accounts.[10] When a TMP or notice partner had multiple addresses in these databases, TSU mailed a copy to each address.

Sacramento TSU generated a certified mailing list (CML) as proof of mailing the BLIPS FPAAs. A CML is computer-generated and contains the names and the addresses used to mail FPAAs to TMPs and

---

[9] Normally TSU prepares and issues the FPAA to a TMP and then sends the partnership file to the Ogden or Brookhaven service center to prepare and mail the notice partner FPAAs. It is proper to issue FPAAs to the TMP and notice partners on the same day. *See* § 6223(d)(2) (providing that the IRS must mail a FPAA to the notice partners no later than 60 days after mailing the FPAA to the TMP); *PCMG Trading Partners XX, L.P. v. Commissioner*, 131 T.C. 206, 207 (2008) (involving FPAAs issued to the TMP and notice partners FPAA on the same day).

[10] PCS contains the names and TINs shown for the partners on Schedules K–1. *See* IRM 4.31.2.3.3(1) (May 31, 2005), 4.31.3.3.3(2)(E) (June 4, 2004). The campus TEFRA function is responsible for maintaining the information on PCS. *See* IRM 4.31.2.2.9.2(1)(F) (2004). The campus TEFRA function is part of IRS service centers and is separate from TSU, which is part of Exams. *See* IRM 4.31.1.2(1)(E) (June 5, 2013). PCS is used to generate FPAAs. *See* IRM 4.29.5.1(1). IDRS is used to generate taxpayer transcripts, including the FINDSD transcript which shows the address that taxpayers use on their personal returns. *See May v. Commissioner*, T.C. Memo. 2014-194, at \*12 n.6, *aff'd sub nom. Best v. Commissioner*, 702 F. App'x 615 (9th Cir. 2017).

**[\*12]** notice partners. TSU provided the CML to the USPS employee who receives the FPAAs for mailing, and the USPS employee completes the CML by adding a USPS postmark, his signature, the number of pieces of mail on the CML, and the number of pieces of mail that the USPS received for mailing. Sacramento TSU RA April Basura reviewed the addresses on the CML and DSIF's TMP and notice partner FPAAs for accuracy and confirmed that postage had been placed on the FPAAs' mailing envelopes. She then wrote her initials on the lower left-hand corner of the CML. On December 17, 2004, RA Basura drove the DSIF FPAAs to the USPS for mailing. She watched while a USPS employee completed the CML. The USPS employee returned the CML to RA Basura, and the CML was retained in the files at Sacramento TSU.

Sacramento TSU mailed the FPAAs to DSIF's TMP (TMP FPAA) and its three members Presidio Growth, Presidio Resources, and Bogan on the same date, December 17, 2004. It mailed a copy of the notice partner FPAA to Bogan at both the Schedule K–1 and the East Hansen addresses. Neither copy included Mr. Blum's name in the address. Sacramento TSU did not request return receipt for either copy and was not required to do so under the Code. There is no evidence in the record that the USPS returned either copy of the notice partner FPAA to the IRS as undeliverable.

In the FPAA, among other adjustments, respondent determined that DSIF did not exist as a matter of fact. In the alternative he determined that DSIF was formed solely for tax avoidance purposes and that DSIF and the BLIPS transactions had no purpose other than tax avoidance and lacked economic substance. In the second alternative he determined that DSIF was a sham. He further determined that DSIF had not established the identities or names of its partners or each partner's distributive share of partnership items. He determined that the allocation of partnership items in the LLC agreement did not have substantial economic effect and reallocated Presidio Growth, Presidio Resources, and Bogan each a one-third interest in DSIF.

Respondent produced a completed CML as evidence that the IRS mailed the notice partner FPAA to Bogan at both the Schedule K–1 and East Hansen addresses. The CML has a USPS postmark and is signed by a USPS employee. The USPS employee also completed the spaces on the CML for the number of pieces of mail listed on the CML for mailing, seven, and the number of pieces of mail that the USPS received for mailing, seven. The CML also shows USPS tracking numbers that correspond to the tracking numbers on the notice partner FPAAs.

**[\*13]** On February 28, 2005, the IRS generated Form 886–Z(C), Partner's or S Corporation Shareholders' Shares of Income, for DSIF's 1999 taxable year, which identified Bogan as a notice partner and provided its address as follows:

> Bogan Ventures, LLC c/o Scott A. Blum
> xxx E. Hansen
> P.O. Box xxxx
> Jackson, WY

Form 886–Z(C) is computer generated using information on PCS. The Form shows the partners' names, addresses, TINs, and income and loss percentages. IRM 4.29.5.2.10(1) (Jan. 1, 2003), 4.29.5.2.1(2) (Mar. 1, 2006). The IRS uses Form 886–Z(C) to verify the profit and loss interests of each partner and to identify each partner's distributive share of partnership items as adjusted in the FPAA. *See* IRM 4.31.3.6.2.3(6)(C) (2004). It uses Form 886–Z(C) to show how the adjustments to the partnership return affect each partner's distributive shares of partnership and affected items. *See H Graphics/Access, Ltd. P'ship v. Commissioner*, T.C. Memo. 1992-345; IRM 4.31.3.6.2.3(6)(C). It uses Form 886–Z(C) to verify that all notice partners and their profit and loss interests have been correctly identified and that all notice partners were issued an FPAA by comparing the names on the Form with the CML. *See* IRM 4.31.3.5.6(8) (2004), 4.31.2.2.15.1 (2004). The IRS generates Form 886–Z(C) in conjunction with the preparation of an FPAA and revises the Form when it receives updated information. DSIF's February 28, 2005, Form 886–Z(C) shows that its three members, Bogan, Presidio Growth, and Presidio Resources, each had a percentage of profits of zero.

IV.    *Partnership-Level Case*

On March 17, 2005, DSIF's TMP Presidio Growth timely filed a consolidated petition for review of the FPAA adjustments in the District Court for the Northern District of California. The consolidated petition also pertained to 62 other BLIPS cases. *See Sixty-Three Strategic Inv. Funds v. United States* (*63 SIFs* case), No. 05-CV-01123 (N.D. Cal. Mar. 17, 2005). Presidio Growth was the TMP for all 63 partnerships in the *63 SIFs* case. The TMP filed a certification of interested entities or parties with the consolidated petition that listed Bogan and Mr. Blum as interested entities and persons. *Id.* The certification provided an address for Bogan in Houston, Texas, in care of the TMP, and for Mr. Blum it provided the Schedule K–1 address with "Scott A. Blum

[*14] Separate Property Trust" on the second line of the address. On November 7, 2005, the district court stayed the *63 SIFs* case pending the resolution of the criminal cases of the BLIPS promoters, which was resolved in early 2009.

Petitioners were aware of the district court case while it was ongoing. Pursuant to section 6226(c), DSIF's partners were parties to the district court case. Petitioners did not have a right to file their own petition in district court or in this Court although they had the right to intervene in the *63 SIFs* case. *See* § 6226(b) (providing that a notice partner may file a petition only if the TMP has not filed a petition). Petitioners knew about the *63 SIFs* case and chose not to intervene on Bogan's behalf.

In August 2011, while the *63 SIFs* case was ongoing, petitioners sent a letter to the IRS asking about settling their BLIPS tax shelter loss and specifically stated that the loss was at issue in the *63 SIFs* case. In response the IRS stated that petitioners would be required to concede all adjustments pertaining to DSIF to be removed from the *63 SIFs* case. Petitioners did not pursue the settlement.

In July 2014 the district court held that the BLIPS transactions lacked economic substance and were disregarded for federal tax purposes. It granted summary judgment to the Government sustaining all adjustments in the FPAAs except for interest income from the BLIPS loans. *Shasta Strategic Inv. Fund, LLC v. United States*, No. C-04-04264, 2014 WL 3852416 (N.D. Cal. July 31, 2014); *see also Shasta Strategic Inv. Fund LLC v. United States*, 76 F. Supp. 3d 895 (N.D. Cal. 2014). It held that the section 6662(h) gross valuation misstatement penalties provisionally applied. *See* § 6221 (requiring the tax treatment of any partnership item including the applicability of any penalty relating to the adjustment of any partnership item be determined in a TEFRA partnership case); *United States v. Woods*, 571 U.S. 31, 41 (2013). The court did not address the FPAAs' alternative position that the partnerships were shams. It entered its decision on January 20, 2015.

V.    *Prior Tax Court Case*

On November 10, 2005, while the *63 SIFs* case was ongoing, respondent issued a Notice of Deficiency to petitioners for 1998, 1999, and 2002 (2005 Notice of Deficiency). CI approved the issuance of the Notice of Deficiency before its issuance. Among other adjustments,

**[\*15]** respondent disallowed petitioners' $45 million OPIS tax shelter loss for 1998 and $78.5 million BLIPS tax shelter loss for 1999. Respondent adjusted Mr. Blum's bases in the DSIF assets to zero and determined a deficiency of over $15 million attributable to the adjustments relating to the BLIPS tax shelter. For 1999 he also disallowed a $1,754,670 capital loss from an equity swap that was part of the OPIS tax shelter (OPIS swap).

Respondent mailed the 2005 Notice of Deficiency to petitioners at the post office box address. Petitioners filed a Petition with this Court. *Blum v. Commissioner* (*Blum I*), No. 2679-06 (T.C. filed Feb. 6, 2006). They asserted that the Notice of Deficiency was invalid with respect to the BLIPS adjustments because the adjustments were partnership or affected items. *See* Amendment to Petition, *Blum I*, No. 2679-06 (Mar. 9, 2006). They asserted that DSIF's TMP filed a petition in district court for readjustment of the BLIPS adjustments and specifically cited the *63 SIFs* case. *Id.* They asserted that the BLIPS adjustments are affected items that may not be made until the conclusion of the *63 SIFs* case. *Id.* We dismissed the BLIPS adjustments for lack of jurisdiction on the basis that the adjustments were partnership or affected items and were at issue in the ongoing *63 SIFs* case. *See* Order, *Blum I*, No. 2679-06 (July 3, 2006); *see also Blum I*, T.C. Memo. 2012-16, slip op. at 2 (stating that we had "dismissed for lack of jurisdiction those portions of the deficiencies and penalties pertaining to petitioners' [BLIPS] transaction"), *aff'd*, 737 F.3d 1303 (10th Cir. 2013).

We issued a Memorandum Opinion in *Blum I* that disallowed the OPIS tax shelter loss for 1998 and the $1,754,670 capital loss from the OPIS swap for 1999. *Blum I*, T.C. Memo. 2012-16, slip op. at 19. Following the issuance of our Opinion, respondent prepared a computation of petitioners' deficiencies for 1998, 1999, and 2002. He prepared the 1999 deficiency in accordance with *Munro v. Commissioner*, 92 T.C. 71 (1989) (*Munro* computation), to determine the 1999 deficiency solely on the basis of *Blum I* without accounting for adjustments pertaining to the BLIPS tax shelter. The parties filed respondent's computation as an agreed computation under Rule 155. The parties agreed to a deficiency of $373,641 for 1999 that is mainly attributable to a $1,754,670 adjustment for the OPIS swap.

On June 1, 2012, we entered a Decision reflecting the parties' agreed computation of deficiencies of $9,279,861, $373,641, and $18,737 for 1998, 1999, and 2002, respectively, a section 6662(h) penalty of $3,697,388 for 1998, and a section 6662(b) penalty of $66,619 for 1999.

[*16] Decision, *Blum I*, No. 2679-06 (T.C. June 1, 2012), No. 98 (*Blum I* Decision). The Decision stated that it is "incorporating herein the facts recited in [the] computation as the findings of the Court." The Decision states that "[i]t is further stipulated that this decision does not include adjustments subject to separate determination under . . . TEFRA." In September 2012 the IRS assessed tax and penalties set forth in the Decision plus interest.

VI.    *Closing Agreement*

Following *Blum I*, the IRS issued a Notice of Federal Tax Lien (NFTL) and a Notice of Intent to Levy to petitioners for 1998 and 1999. Petitioners requested a collection due process (CDP) hearing with the IRS Office of Appeals (Appeals) for the NFTL in August 2014.[11] During the CDP hearing, petitioners argued that interest should be abated for 1998 and 1999 because the criminal investigations connected to the BLIPS tax shelter delayed resolution of *Blum I* and that petitioners agreed to continuances to allow the criminal investigations to proceed. The settlement officer (SO) agreed to a partial interest abatement but denied petitioners' request to withdraw the NFTL. The SO prepared Form 12257, Summary Notice of Determination, to reflect Appeals' agreement to a partial interest abatement for 1998 and 1999 of approximately $5.8 million. In the Summary Notice of Determination, the SO wrote that the IRS would withdraw the NFTL when petitioners fully paid the tax that had been assessed for 1998 and 1999. The SO also wrote that "[n]o collection alternatives have been granted . . . because another liability is expected to be assessed which will increase the amount you owe for the 1999 tax year." The SO understood that approximately $15 million of tax related to the BLIPS tax shelter was not yet assessed against petitioners for 1999.

By fax dated August 27, 2015, the SO informed petitioners that their remaining unpaid balance through October 8, 2015, was $3,763,340. The SO wrote that this amount "does not include any currently unassessed liabilities which are anticipated from other litigation or related proceedings." Petitioners signed the Summary Notice of Determination and returned it to the SO by fax on August 31, 2015, thereby waiving their right to judicial review of the SO's determinations. On September 30, 2015, petitioners paid $3,763,340,

_____

[11] On July 1, 2019, the IRS Office of Appeals was renamed the IRS Independent Office of Appeals. *See* Taxpayer First Act, Pub. L. No. 116-25, § 1001, 133 Stat. 981, 983 (2019). Although the record is unclear, it seems that petitioners had a separate CDP hearing for the proposed levy. Respondent collected by levy.

[*17] which respondent applied for 1998. By that date, petitioners had paid their 1999 assessed balance, less the amount of the interest to be abated, in full.

After petitioners paid their assessed balances for 1998 and 1999, they entered into a Closing Agreement on Final Determination Covering Specific Matters with Appeals in December 2015, in which the IRS agreed to a partial abatement of interest for 1998 and 1999. The SO drafted the closing agreement. According to the closing agreement, petitioners alleged during the CDP hearing that RA Politzer told them that they qualified for interest abatement, which was correct under section 6404(g). Interest abatement was permitted when petitioners' audit was ongoing, but Congress subsequently amended the law to eliminate interest abatement retroactively. The closing agreement states that Appeals agreed to abate interest because of the hazards of litigation and "a compelling issue of fairness" under section 6404(a).

The closing agreement states that with the September 30, 2015, payment, petitioners had "full paid the balance of the liability" for 1998 and 1999. Although Appeals agreed to withdraw the NFTL, the closing agreement states that a new NFTL might be filed with respect to any future assessments. The closing agreement did not include the standardized terms that the IRS used for closing agreements pursuant to the BLIPS tax shelter settlement initiative or the text contained in Announcement 2004-46 for closing agreements for the settlement initiative.

VII.   *Consents to Extend Limitations Periods*

DSIF's TMP Presidio Growth signed three Forms 872–P, Consent to Extend the Time to Assess Tax Attributable to Partnership Items (TMP consents), to extend the limitations period for 1999 to December 31, 2004. The copy of the TMP consent in the record that extends the limitations period to June 30, 2004, is signed by the TMP but not the IRS. Petitioners and the IRS also executed multiple Forms 872 (individual consents) to extend petitioners' personal limitations period for 1999 to December 31, 2005. The individual consents did not expressly extend the limitations period to assess tax attributable to partnership or affected items. Respondent has been unable to find paper copies of the partnership or individual consents and has produced electronic copies.

**[*18]** VIII. *Issuance of Affected Items Notices of Deficiency*

On November 30, 2015, respondent issued a Notice of Computational Adjustment to petitioners for 1999 for affected items from the BLIPS tax shelter adjustments that did not require partner-level determinations, including adjustments to petitioners' share of DSIF's interest income and their itemized deductions plus a section 6662(h) penalty attributable to these adjustments. However, the Notice of Computational Adjustment did not include a section 6662(h) penalty attributable to the disallowance of the $78.5 million BLIPS tax shelter loss.

On December 8, 2015, respondent issued three affected items Notices of Deficiency to petitioners, one each for 1999, 2007, and 2010, determining deficiencies of $14,911,356, $214,385, and $736,216, respectively. In the 1999 affected items Notice of Deficiency respondent determined that the district court had sustained all adjustments made in the FPAA, except for respondent's adjustment to DSIF's interest income from the BLIPS loans. For 1999 respondent determined that petitioners had bases of zero in the DSIF assets and disallowed the $78.5 million tax shelter loss. He disallowed the carryforward of the loss to 2007 and 2010. He also determined section 6662(h) gross valuation misstatement penalties of $5,964,542, $85,754, and $294,486 for 1999, 2007, and 2010, respectively, and a section 6651(a)(1) addition to tax of $10,719 for failing to timely file the 2007 return.

OPINION

I. *Mailing of Notice Partner FPAA*

Petitioners challenge the validity of the affected items Notices of Deficiency. They argue that the IRS failed to mail a notice partner FPAA to Mr. Blum at his correct address. We address petitioners' argument in two parts: (1) whether Mr. Blum was a notice partner entitled to receive the notice partner FPAA in lieu of Bogan and (2) what the correct address for mailing the notice partner FPAA was. We find that Mr. Blum was not entitled to receive the notice partner FPAA in lieu of Bogan. We further find that the Schedule K–1 address was the correct address for the IRS to mail Bogan's notice partner FPAA to. By mailing the notice partner FPAA to Bogan at the Schedule K–1 address, the IRS satisfied the TEFRA notice requirements of the Code and the regulations.

The IRS was not required to send a copy of the notice partner FPAA to either the East Hansen or the post office box address because

**[\*19]** neither address was Bogan's address. Petitioners did not argue that Bogan's address was the post office box address. Rather, they argue that Mr. Blum's address was the post office box address. Nevertheless, we address petitioners' argument that Mr. Blum's correct address was the post office box address for the sake of completeness. We find that even if Mr. Blum was entitled to receive the notice partner FPAA as an indirect partner, the IRS was not required to mail a copy to the post office box address because petitioners failed to update their address in accordance with the Code and the regulations for purposes of receipt of FPAAs. Moreover, we find that petitioners received a copy of the notice partner FPAA. Thus, the IRS's decision to send a copy of the notice partner FPAA to Bogan at both the Schedule K–1 and the East Hansen addresses ensured delivery of the notice partner FPAA to petitioners.

### A. *Remedy for Failure to Issue a Notice Partner FPAA*

Taxpayers are entitled to challenge the validity of an affected items Notice of Deficiency on the grounds that the IRS failed to issue a notice partner FPAA to them. When the IRS fails to mail an FPAA to a notice partner, section 6223(e) is the exclusive remedy for the notice partner. *See Wind Energy Tech. Assocs. III v. Commissioner*, 94 T.C. 787 (1990); *Wayne Caldwell Escrow P'ship v. Commissioner*, T.C. Memo. 1996-401. Section 6223(e) allows the affected notice partner to elect to convert the partnership items into nonpartnership items. *See Taurus FX Partners, LLC v. Commissioner*, T.C. Memo. 2013-168, at \*17. When the affected partner elects to have the partnership items treated as nonpartnership items, the normal deficiency procedures apply to that partner. *See* § 6231(b)(1)(D); *Crowell v. Commissioner*, 102 T.C. 683, 692–94 (1994).

The parties have not adequately addressed the application of section 6223(e). However, further discussion of section 6223(e) is unnecessary because we find that the IRS properly and timely mailed a notice partner FPAA to Bogan in accordance with the Code and the regulations and that petitioners received it. Thus, the affected items Notices of Deficiency are valid.

### B. *Actual Receipt of Notice Partner FPAA*

The parties dispute whether the IRS properly mailed a notice partner FPAA with respect to Mr. Blum's indirect interest in DSIF. For that reason, we address the mailing issue below. However, before we do so, we make the following critical findings. First, petitioners had actual

[*20] notice that the IRS issued a TMP FPAA for DSIF. In *Blum I* they admitted to this Court that they knew about the *63 SIFs* case. They told this Court that DSIF's TMP had filed a petition in district court for redetermination of the BLIPS adjustments. Second, we find it highly suspect that petitioners did not appear before this Court to give their testimony that they did not receive the notice partner FPAA.[12] It is well established that the failure of a party to introduce evidence within his possession which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable. *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158, 1165 (1946), *aff'd*, 162 F.2d 513 (10th Cir. 1947); *see also DiDonato v. Commissioner*, T.C. Memo. 2013-11, at *59 (making a negative inference from the taxpayer's failure to testify); *Gigliobianco v. Commissioner*, T.C. Memo. 2012-276, at *18 (making a negative inference from the taxpayer's accountant's failure to testify). Third, there is no evidence in the IRS's records that either copy of the notice partner FPAA was returned to the IRS as undeliverable. In consideration of the entirety of the record, we find that petitioners in fact received a copy of the notice partner FPAA mailed to Bogan.[13]

C. *Proof of Mailing*

The Commissioner has the burden of proving that the IRS properly mailed a notice partner FPAA by competent and persuasive evidence.[14] *Clough v. Commissioner*, 119 T.C. 183, 187 (2002). We analyze the effect of errors in the address used for mailing an FPAA in the same way that we analyze errors in the mailing of a Notice of Deficiency. *See Sealy Power, Ltd. v. Commissioner*, 46 F.3d 382, 386 (5th Cir. 1995), *aff'g in part, rev'g and remanding in part* T.C. Memo. 1992-168; *Petaluma FX Partners, LLC v. Commissioner*, T.C. Memo.

---

[12] Petitioners filed Declarations that they did not receive the notice partner FPAA in support of summary adjudication. The Declarations are hearsay. Respondent did not have an opportunity to cross-examine petitioners, and there is no way for the Court to ascertain their credibility.

[13] We question why petitioners waited over five years after they filed the Petition to allege that respondent failed to mail the notice partner FPAA. Even then they did not assert that they did not receive the FPAA. Rather, they asserted that respondent had not provided evidence that he mailed a notice partner FPAA to them. They waited another two and one-half years to deny receipt of the notice partner FPAA. Respondent has not argued that petitioners raised a new issue. However, shifting of the burden of proof is immaterial in this case because we rule for respondent.

[14] Respondent argues that we should judicially estop petitioners from disputing the proper mailing of the notice partner FPAA on the basis of *Blum I*'s dismissal of the BLIPS adjustments. In our discretion, we decline to apply judicial estoppel to establish mailing.

[*21] 2007-254. To meet his burden, the Commissioner must introduce evidence showing that he delivered the FPAAs to the USPS for mailing. *Cataldo v. Commissioner*, 60 T.C. 522, 524 (1973), *aff'd per curiam*, 499 F.2d 550 (2d Cir. 1974). Actual receipt of the FPAA is not required for an FPAA to be valid. *See Cropper v. Commissioner*, 826 F.3d 1280, 1285 (10th Cir. 2016), *aff'g* T.C. Memo. 2014-139; *Crowell*, 102 T.C. at 692; *Han Kook LLC I-D v. Commissioner*, T.C. Memo. 2011-223. "There is a strong presumption in the law that a properly addressed letter will be delivered, or offered for delivery, to the addressee." *McClaskey v. Commissioner*, T.C. Memo. 2008-147, slip op. at 8 (quoting *Zenco Eng'g. Corp. v. Commissioner*, 75 T.C. 318, 323 (1980), *aff'd*, 673 F.2d 1332 (7th Cir. 1981) (unpublished table decision)); *see also Greenberg v. Commissioner*, 10 F.4th 1136, 1162 (11th Cir. 2021), *aff'g* T.C. Memo. 2018-74.

When the existence of an FPAA is not disputed, a properly completed CML is prima facie evidence of the date and fact of mailing and raises a rebuttable presumption that the FPAA was delivered. *Hoyle v. Commissioner*, 131 T.C. 197, 203 (2008), *supplemented by* 136 T.C. 463 (2011); *Clough*, 119 T.C. at 187–88; *Coleman v. Commissioner*, 94 T.C. 82, 91 (1990). It is well established that a properly completed CML is the equivalent of USPS Form 3877, Firm Mailing Book For Accountable Mail, which the IRS uses to establish mailing of notices of deficiency. *See Clough*, 119 T.C. at 185 n.3. The presumption does not apply if the FPAA was mailed to an incorrect address. *See BM Constr. v. Commissioner*, T.C. Memo. 2021-13, at *12.

The U.S. Court of Appeals for the Tenth Circuit, to which this case is appealable absent stipulation to the contrary, has stated that a CML is complete when it contains (1) the taxpayer's address used to send the FPAA to; (2) the certified mail tracking number of each piece of mail; (3) a USPS date stamp indicating the date that the IRS delivered the FPAAs to the USPS; (4) the number of pieces received by the USPS; and (5) the signature of the USPS employee who received the FPAA. *See Walcott v. United States*, 782 F. App'x 728, 732 (10th Cir. 2019); *Cropper v. Commissioner*, 826 F.3d at 1286. Our Court generally requires (1) the taxpayer's name and address; (2) the certified mail tracking number; (3) a USPS date stamp; (4) the number of pieces of mail submitted to the USPS and received by the USPS; and (5) the signature or initials of the USPS employee who received the FPAA. *See Chinweze v. Commissioner*, T.C. Memo. 2022-56, at *7.

**[\*22]** A properly completed CML shifts the burden to the taxpayer to show that the notice partner FPAA was not actually or properly mailed. *Coleman*, 94 T.C. at 91. The Tenth Circuit requires taxpayers to present "clear and convincing evidence" of irregularity in mailing to rebut the presumption. *Cropper v. Commissioner*, 826 F.3d at 1285–86 (quoting *Welch v. United States*, 678 F.3d 1371, 1378 (Fed. Cir. 2012)). Our Court has allowed taxpayers to rebut the presumption with "clear evidence" of irregularity in mailing. *See Pietanza v. Commissioner*, 92 T.C. 729, 739 (1989), *aff'd*, 935 F.2d 1282 (3d Cir. 1991) (unpublished table decision). Taxpayers may rebut the presumption by showing that the IRS did not follow its established mailing procedures. *Coleman*, 94 T.C. at 91; *BM Constr.*, T.C. Memo. 2021-13, at \*12. When the taxpayer rebuts the presumption created by the CML, we weigh the evidence to determine, on the basis of the preponderance of the evidence, whether the IRS mailed the FPAA. *See Chinweze*, T.C. Memo. 2022-56, at \*7. A taxpayer's self-serving testimony that he did not receive the FPAA is insufficient to rebut the presumption. *Id.* at \*8; *Biomage, LLC v. Commissioner*, T.C. Memo. 2013-202, at \*9.

After the parties filed their Answering Briefs, petitioners moved for leave to file a response to respondent's Answering Brief, arguing that respondent made new arguments and findings of fact therein and that they did not have an opportunity to respond. We granted petitioners' Motion and allowed both parties to file an additional brief. In their Brief petitioners argue that respondent admitted that the CML contains false information, and, accordingly, we should not allow respondent to rely on the CML.[15] We find that respondent has not admitted that the CML contains false information. Furthermore, there is no evidence in the record that the CML contains false information.

Respondent's Opening Brief (not the Answer Brief as petitioners assert) states: "Accordingly, the Service properly mailed [DSIF's] FPAA to Bogan only [sic] as the only partner (other than Presidio) entitled to notice under I.R.C. § 6223(a)." Petitioners argue that this statement concedes that the CML contains false information. We strongly disagree. This statement is the concluding sentence of a section of the Opening Brief that addresses whether Bogan or Mr. Blum was DSIF's notice partner. When we read the section of the Brief in its entirety, we

---

[15] In their Motion petitioners also asserted that respondent raised a new argument in his Answering Brief concerning the constitutionality of his conduct when he issued the Notice of Deficiency and DSIF's FPAA. We allowed petitioners to respond to this argument. We find no unconstitutional conduct.

[*23] understand respondent to argue that (1) Bogan was a notice partner and Mr. Blum was not a notice partner and (2) the Code and the regulations required the IRS to mail the notice partner FPAA only to Bogan and not to Mr. Blum. Respondent has not conceded that the IRS did not mail a notice partner FPAA to Presidio Growth or Presidio Resource.

Respondent has produced a completed CML to establish that the IRS mailed the notice partner FPAA to Bogan at the Schedule K–1 and the East Hansen addresses. The CML shifts the burden to petitioners to show that the notice partner FPAA was not mailed to those addresses. Petitioners' argument is twofold. They argue that the CML does not create a presumption in this case because the IRS did not mail the notice partner FPAA to Mr. Blum at the correct address. In the alternative they attempt to rebut the presumption by arguing that the IRS failed to follow its established procedures.

D.     *Statutory and Regulatory Requirements for Mailing Notice Partner FPAAs*

Under the Code, the IRS is required to mail the notice partner FPAA to the names and addresses of the partners that are shown on the partnership return for the taxable year at issue or the names and addresses that are furnished to the IRS by the TMP or any other person in accordance with the Treasury regulations. § 6223(a), (c)(1) and (2). However, the IRS must receive, at least 30 days before it mails the TMP FPAA, sufficient information about the partner's names and addresses to enable it to determine that the partner is entitled to a notice partner FPAA and to provide the notice partner FPAA to the partner. § 6223(a).

The regulations specify the required content of the written statement and where the written statement must be filed. Temp. Treas. Reg. § 301.6223(c)-1T(b), 52 Fed. Reg. 6784 (Mar. 5, 1987); *see* Treas. Reg. § 301.6223(c)-1(b) (effective for partnership taxable years beginning on or after October 4, 2001). The regulations require the written statement to (1) identify the partnership and identify each partner whose address is being updated; (2) explain that the information is being furnished to correct or supplement earlier information for a partner; (3) specify the taxable year to which the information relates; (4) state the corrected or additional information; and (5) be signed by the person supplying the updated address and provide his name, address, and TIN (written statement requirement). Temp. Treas. Reg. § 301.6223(c)-1T(b)(3). The TMP, a partner, or any other person may

**[\*24]** provide the written statement. § 6223(c)(2). The written statement must be filed with the IRS service center where the partnership filed its return or, if the person filing the written statement knows that an NBAP has been mailed to the TMP, the IRS office that issued the NBAP. Temp. Treas. Reg. § 301.6223(c)-1T(b)(2).

If an updated address is furnished to the IRS in accordance with the regulations, the IRS is required to mail the notice partner FPAA to the updated address so long as the IRS receives the written statement at least 30 days before it mails the notice partner FPAA. Temp. Treas. Reg. § 301.6223(c)-1T(a) and (b)(1); *see also* § 6223(c)(2).

A similar rule applies to furnishing the name and address of an indirect partner as the notice partner by virtue of the indirect partner's ownership interest in a passthrough notice partner. *See* § 6223(c)(3). The IRS is required to mail the notice partner FPAA to the indirect partner in lieu of the passthrough partner if the indirect partner's name, address, and indirect profits interest is shown on the partnership return for the year at issue or is furnished to the IRS pursuant to the written statement requirement. *Id.*; Temp. Treas. Reg. § 301.6223(c)-1T(b); *see Gaughf Props., L.P. v. Commissioner*, 139 T.C. 219 (2012), *aff'd*, 738 F.3d 415 (D.C. Cir. 2013). In such a case the indirect partner is the notice partner. *See* § 6231(a)(8).

The regulations recognize that in certain instances, an address may be updated or the identity of an indirect partner may be furnished to the IRS in a manner that does not satisfy the written statement requirement. *See* Temp. Treas. Reg. § 301.6223(c)-1T(f). In such instances the IRS "may use" that information to mail notice partner FPAAs. *Id.* The regulations provide that the IRS may use "other information in its possession (for example, a change in address reflected on a partner's return)." *Id.*; *see Murphy v. Commissioner*, 129 T.C. 82, 87–88 (2007). However, the regulations also make it clear that the IRS "is not obligated to search its records for information not expressly furnished" on the partnership return for the year at issue or in a written statement in accordance with the regulations. Temp. Treas. Reg. § 301.6223(c)-1T(f); *see Murphy*, 129 T.C. at 87; *Taurus FX Partners*, T.C. Memo. 2013-168, at \*13–14, \*16 (holding that a partnership return that listed indirect partner's name in the capacity of "in care of" was insufficient to notify the IRS that the indirect partner was a notice partner).

**[\*25]**     1.     *Proper Partner and Address for Mailing DSIF's Notice Partner FPAA*

Respondent argues that when the IRS mailed the notice partner FPAA, Bogan was DSIF's notice partner and Bogan's address was the Schedule K–1 address. Petitioners do not appear to challenge that the Schedule K–1 address was the correct address for Bogan. Rather, they argue that the IRS was required to mail the notice partner FPAA to Mr. Blum as DSIF's indirect partner in lieu of Bogan and that Mr. Blum's address was the post office box address. We find that Bogan was the notice partner and that it was proper for the IRS to mail the notice partner FPAA to Bogan at the Schedule K–1 address.

Mr. Blum's identity as an indirect partner was not furnished on DSIF's 1999 partnership return or in a written statement in accordance with the regulations. Schedule K–1 informed the IRS that Bogan was DSIF's partner. It did not indicate that Bogan was a single-member LLC or a disregarded entity. It did not disclose that Mr. Blum was its sole member or DSIF's indirect partner. Nor did any other part of DSIF's return disclose this information. Mr. Blum's name was not anywhere on DSIF's return. Accordingly, the IRS was not required to mail a copy of the notice partner FPAA to Mr. Blum.

Petitioners have not identified any document in the record that satisfies the written statement requirement. Accordingly, we find that Mr. Blum was not entitled to the notice partner FPAA as DSIF's indirect partner in lieu of Bogan. For the sake of completeness, we further find that neither Bogan's nor Mr. Blum's address was updated to the post office box address pursuant to the written statement requirement. Petitioners have not identified any document in the record that updates Bogan's or Mr. Blum's address in accordance with the written statement requirement.

Petitioners argue that a letter to RA Politzer from their former representative dated April 11, 2002, satisfies the regulation's written statement requirement. We disagree. The version of the letter in the record does not include the information required for the written statement. It does not identify Mr. Blum as the sole owner of Bogan or as an indirect partner of DSIF.[16] It does not state that updated information is being provided to supplement information on Bogan's

---

[16] The letter appears to restate the information document requests and generally responds with "[p]lease see attached." The version of the letter in the record does not include any attachments.

[*26] Schedule K–1. In fact, the version of the letter in the record does not mention DSIF. Moreover, the letter was sent before the IRS mailed the NBAP. Accordingly, the written statement had to be furnished to the IRS service center where DSIF's 1999 return was filed. *See* Temp. Treas. Reg. § 301.6223(c)-1T(b)(2). A letter mailed to an RA does not satisfy the written statement requirement.

The record includes numerous communications, i.e., emails and faxes, between RA Politzer and petitioners' representatives during the course of the audit, none of which satisfies the regulation's written statement requirement. None of the communications contains Bogan's or DSIF's name or a statement that an address is being furnished to correct or supplement Bogan's or Mr. Blum's address, or specifies the 1999 taxable year or the signature, address, and TIN of the person supplying the information. *See* Temp. Treas. Reg. § 301.6223(c)-1T(b).

In fact petitioners do not argue that any of these communications (apart from the April 11, 2002, letter) satisfies the written statement requirement. Rather, they argue that these communications establish that RA Politzer knew that Mr. Blum was DSIF's indirect partner and knew petitioners' USPS mailing address was the post office box address. They point out that she used the post office box address to mail notices and other correspondence to petitioners, including notices that she addressed to Bogan. It is clear under the Code, the regulations, and our caselaw that this is not enough. *See, e.g.*, *Block Devs., LLC v. Commissioner*, T.C. Memo. 2017-142, at *23–24; *Estate of Simon v. Commissioner*, T.C. Memo. 2013-174. The regulations provide detailed instructions for furnishing the indirect partner's name and updating partner addresses, which petitioners did not follow.

We have repeatedly held that an individual IRS employee's knowledge of a different address for a partner from the address furnished on the partnership return and the employee's use of that address to send correspondence is insufficient to update the partner's address for sending FPAAs. *Block Devs.*, T.C. Memo. 2017-142, at *23–24; *Stone Canyon Partners v. Commissioner*, T.C. Memo. 2007-377, slip op. at 4, *aff'd sub nom. Bedrosian v. Commissioner*, 358 F. App'x 868 (9th Cir. 2009). An RA's mailing of correspondence does not alter the IRS's obligations with respect to the address for mailing a notice partner FPAA. *Triangle Invs. Ltd. P'ship v. Commissioner*, 95 T.C. 610, 616 (1990). Rather, information furnished to the RA falls into the category of the type of information that the IRS "may use" to mail a notice partner FPAA. However, the IRS is not required to use the

[*27] information. *Block Devs.*, T.C. Memo. 2017-142, at *23–24. The IRS is required to mail a notice partner FPAA to the address on the partnership return for the year at issue or an address that is furnished to the IRS in accordance with the regulations. *Id.* It is not required to use address information or the name of an indirect partner contained in an RA's personal working files.

Moreover, none of the communications with RA Politzer clearly identifies the post office box address as petitioners' address for USPS delivery. During the audit RA Politzer made multiple requests for petitioners' address. Petitioners provided both the East Hansen and the post office box addresses to RA Politzer. They called the East Hansen address their "current address" and "home address" and the post office box address their "correct mailing address." They did not tell RA Politzer that they were updating their address or Bogan's address. They did not tell RA Politzer that the USPS did not deliver to the East Hansen address or that a post office box was required for USPS mail. Rather, they are forced to rely on a USPS stamp "No Street Delivery" "Box # Required" on envelopes addressed to them at the East Hansen address that the USPS returned to RA Politzer. However, the USPS also returned mail to RA Politzer that she addressed to Mrs. Blum and Bogan at the post office box address. These communications indicate that RA Politzer did not know petitioners' address for USPS mail delivery. RA Politzer testified at trial, and petitioners failed to elicit testimony about her knowledge of petitioners' address for USPS mail delivery.

The presence of both addresses in RA Politzer's personal files is due to petitioners' vague, inconsistent communications about their address. Petitioners did not update Mr. Blum's address in accordance with the Code and the regulations for the purposes of the mailing of a notice partner FPAA. At best, petitioners provided confusing address information in informal communications with RA Politzer, none of which clearly indicated petitioners' address for USPS mail delivery. A diligent taxpayer would have ensured that the IRS knew that the USPS did not deliver mail to their residence and that a post office box was required for USPS mail delivery. As detailed above, petitioners' address updates were unclear and were limited to an RA's personal working files. Petitioners did not provide the post office box in accordance with the Code and the written statement requirement. More importantly, no one told RA Politzer that the Schedule K–1 address was no longer Bogan's address. As stated above, Bogan was the notice partner, and Mr. Blum was not entitled to a copy of the notice partner FPAA in lieu of Bogan.

**[\*28]**     2.     *Last Known Address Rules*

Petitioners discuss the last known address rules at length in their Briefs. Our caselaw is clear: The last known address rules do not apply to FPAAs. *Taurus FX Partners*, T.C. Memo. 2013-168, at \*8. As previously discussed, the regulations provide specific, detailed instructions on the requirements for updating the address of a notice partner including what information taxpayers are required to provide. Petitioners acknowledge that the last known address rules "do not strictly apply" to FPAAs. Nevertheless, they advocate that we adopt the last known address rules for a subcategory of small TEFRA partnerships. They argue that we should exempt DSIF from the written statement requirement because it had only three partners. There is no such exemption in the Code or the regulations, and we will not create one.

In *Taurus FX Partners*, T.C. Memo. 2013-168, at \*14–15, we explained why TEFRA did not adopt the last known address rules:

> [U]nlike a corporate or an individual income tax proceeding where the examination is directly of the taxpayer's return, a TEFRA proceeding is conducted at the partnership level . . . . The partners who are ultimately liable for the tax can change from year to year. Thus, adjustments resulting from a partnership proceeding relating to one taxable year may affect a completely different set of taxpayers from those who owned an interest in that same partnership in another year. As a result, simply updating address information from a subsequent year's return as is done in deficiency procedures puts the IRS in peril of notifying the wrong people.

Petitioners argue that they provided "clear and concise" notice of the post office box address to RA Politzer as required by Revenue Procedure 2001-18, 2001-1 C.B. 708 (Feb. 20, 2001). First, Revenue Procedure 2001-18 is irrelevant because it deals with how a taxpayer notifies the IRS of a change in his last known address. Second, as we discussed above, petitioners did not provide "clear and concise" notice of an address change to RA Politzer. Rather, they gave RA Politzer two addresses and did not tell her that a post office box was required for USPS mail delivery.

**[\*29]** Finally, we note that petitioners continued to use the Monarch Beach address on their personal returns through 2008. In 2008 they filed a personal return that showed the East Hansen address. From 2002 through 2015 petitioners did not file a return using the post office box address. Petitioners' personal returns show that petitioners continually provided inconsistent and incorrect information to the IRS about their address for USPS mail delivery.

### 3. *Conclusion*

The IRS satisfied the mailing requirements of the Code and regulations by mailing the notice partner FPAA to Bogan at the Schedule K–1 address. No one updated DSIF's partner information to identify Mr. Blum as DSIF's indirect partner who was entitled to a notice partner FPAA in lieu of Bogan. Accordingly, the IRS was not required to mail the notice partner FPAA to Mr. Blum. Nor did anyone update Bogan's address in a written statement that satisfies the requirements of the Code and the regulations. The IRS took the extra step of mailing a copy of Bogan's notice partner FPAA to the East Hansen address. Petitioners received a copy of the notice partner FPAA.

The Code and the regulations clearly place the responsibility for furnishing an updated address and the identity of an indirect partner on the taxpayer. The Code and the regulations limit the IRS's obligations to mailing FPAAs to addresses and partners furnished on the partnership return for the taxable year at issue or in accordance with the written statement requirement. *See Int'l Strategic Partners, LLC v. Commissioner*, 455 F. App'x 91, 92 (2d Cir. 2012) ("It was [the taxpayer's] responsibility to update its contact information with the IRS, if necessary, pursuant to the regulations. It did not do so and cannot impose a burden on the IRS that Congress declined to impose."). The Code also expressly imposes a duty on the TMP to update a partner's name and address, and if the TMP discovers that the previously furnished information is incorrect or incomplete, the TMP is required to "furnish such revised or additional information as may be necessary." § 6230(e).

The simple fact is that petitioners failed to comply with the clear and express written statement requirement of the Code and the regulations. Petitioners have advanced numerous meritless theories about the alleged nonreceipt of the notice partner FPAA. They argue that the IRS knowingly and intentionally mailed the notice partner FPAA to the incorrect address so that petitioners could not dispute the

**[\*30]** disallowance of the BLIPS tax shelter loss. However, DSIF's TMP did challenge the BLIPS adjustments in district court and lost. When a TMP files a petition for review of FPAA adjustments, an individual partner cannot file its own petition for review of the FPAA. *See* § 6226(b).

Although the IRS was not required to mail a copy of Bogan's notice partner FPAA to the East Hansen address, it did so to ensure that petitioners received a copy of Bogan's notice partner FPAA. We find on the basis of the entire record that petitioners received a notice partner FPAA. If the USPS had been unable to deliver a copy of Bogan's notice partner FPAA, it would have been petitioners' own fault. A taxpayer subject to TEFRA is required to follow the procedures detailed in the Code and the regulations.

Mr. Blum chose to own his interest in DSIF through a disregarded entity and to have DSIF issue Schedule K–1 in Bogan's name with Bogan's TIN and address. As we observed in *Taurus FX Partners*:

> In the context of substantive tax matters, the Supreme Court "has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not . . . and may not enjoy the benefit of some other route he might have chosen to follow but did not." This proposition should be no less true in procedural matters.

*Taurus FX Partners*, T.C. Memo. 2013-168, at \*16–17 (footnote omitted) (quoting *Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974)).

The IRS was not required to mail a notice partner FPAA to Mr. Blum. Nor was the IRS required to mail the FPAA to the post office box address. Bogan's notice partner FPAA was properly addressed to the Schedule K–1 address. Accordingly, the IRS satisfied the statutory and regulatory requirements for mailing a notice partner FPAA with respect to Mr. Blum's indirect interest in DSIF. Accordingly, the CML creates a rebuttable presumption of delivery, and we turn to the question of whether petitioners have rebutted that presumption.

E.    *Petitioners' Attempt to Rebut CML Presumption*

Petitioners have attempted to rebut the presumption by arguing that the IRS did not follow its established mailing procedures, that

[*31] freeze code TC 914 prevented mailing of the notice partner FPAA, and that Form 886–Z(C) shows that the IRS had the post office box address for Mr. Blum. The two latter arguments seem to be based on petitioners' position that the IRS was required to mail the notice partner FPAA to Mr. Blum in lieu of Bogan. Although we rejected that position above, we nevertheless address petitioners' arguments relating to TC 914 and Form 886–Z(C) for the sake of completeness.

### 1.    *IRS Mailing Procedures*

Petitioners argue that the IRS did not follow its established procedures for mailing notice partner FPAAs. We find that the witness testimony clearly establishes that the IRS adhered to its established mailing procedures when it mailed a copy of the notice partner FPAA to Bogan at the Schedule K–1 address. IRS procedure is to mail a copy of the notice partner FPAA to every address for the notice partner, i.e., Bogan, in PCS and IDRS. RA Basura explained the procedures that Sacramento TSU used to prepare and mail the TMP and notice partner FPAAs for the BLIPS tax shelter.

RA Basura stated that she reviewed the CMLs, initialed them, and then drove them to the USPS for mailing, where the USPS employee completed the CMLs and returned them to her. The CML in this case has RA Basura's initials in her own handwriting. We find that the procedures are in accordance with respondent's established mailing procedure. Moreover, petitioners mischaracterize RA Basura's testimony about the addresses used for mailing FPAAs. She testified that TSU mails a copy of the FPAA to each address in PCS and IDRS for a notice partner. She did not testify that Sacramento TSU searched IRS records for any address that is known to an IRS employee.

Petitioners did not rebut the presumption created by the CML. Rather, RA Basura's credible testimony establishes that Sacramento TSU mailed a copy of the notice partner FPAA to Bogan. We base our decision that the IRS properly mailed the notice partner FPAA largely on RA Basura's credible testimony. Petitioners did not testify or present any evidence that the copies were not delivered. The preponderance of the evidence establishes that the IRS mailed the notice partner FPAA to Bogan as required by the Code and the regulations.

### 2.    *TC 914 Freeze Code*

Petitioners argue that the presence of TC 914 on their account prevented issuance of a notice partner FPAA to them. They further

[*32] argue that the IRS did not obtain permission to issue the FPAA from CI as required by the IRM. They argue that for this reason the CML is incorrect and cannot create a presumption of delivery. Petitioners' argument fails for numerous reasons.

First, the record, including credible witness testimony, clearly establishes that TC 914 does not prevent issuance of a notice partner FPAA. Moreover, documents in the record establish that the IRS did obtain CI's approval to issue the FPAA for DSIF and a notice partner FPAA to Bogan with respect to Mr. Blum's indirect interest.

Second, to the extent that petitioners rely on them, the IRM, internal memoranda, policy statements, or internal procedures do not have the force of law and confer no rights on taxpayers. *See Thompson v. Commissioner*, 140 T.C. 173 (2013); *see also United States v. Horne*, 714 F.2d 206 (1st Cir. 1983) (holding that a violation of the IRM has no bearing on the validity of assessments).

Third, the IRM does not support petitioners' cause. The IRM clearly shows that the IRS can issue a notice partner FPAA when TC 914 is in effect on a taxpayer's account. The IRM states that if TC 914 cannot be reversed, agreement must be reached with CI to issue an FPAA. IRM 4.31.3.4.15(2)(B) (2004). The IRM states that TC 914 must be lifted to assess tax, however. Both RA Gee and Special Agent Alvarado credibly testified that TC 914 does not prevent issuance of an FPAA or a Notice of Deficiency. They testified that TC 914 does prevent assessment. Special Agent Alvarado also credibly testified that the IRS did not lift TC 914 until the criminal matters were resolved or a BLIPS investor agreed to the settlement initiative so that respondent could assess the agreed-upon tax. Moreover, RA Gee credibly testified that he obtained approval from Special Agent Alvarado to issue the notice partner FPAA to Bogan as well as the 2005 Notice of Deficiency. His testimony is supported by documentary evidence.

Fourth, the filing of the *63 SIFs* case establishes that the IRS mailed the TMP FPAA and the TMP received it, indicating that CI gave approval for issuance of the FPAA for DSIF.

Finally, the fact that the IRS conducted a settlement initiative during the halt memo's 120-day freeze period clearly shows that CI was granting the IRS permission to resolve the audits.

**[\*33]** 3. *Form 886–Z(C)*

Petitioners argue that Form 886–Z(C) is evidence that the post office box address was provided to respondent. Form 886–Z(C) identifies Bogan as the notice partner and provides a two-line address for Bogan: "XXX East Hansen, PO Box XXX."

Form 886–Z(C) is dated February 28, 2005. It was created after the IRS issued Bogan's notice partner FPAA. It does not reflect the address that was in PCS when the IRS mailed Bogan's notice partner FPAA. To overcome that fact, petitioners argue that the February 28, 2005, Form 886–Z(C) must be the same one that the IRS generated before it issued Bogan's notice partner FPAA. They argue that the IRM requires the IRS to continue to use the same Form through the partnership-level proceeding, citing IRM 4.31.2.4.2.5.2(5)(B) (2004). That part of the IRM describes how the IRS closes a partnership case after a petition has been filed in district court and requires the IRS to include Form 886–Z(C) in the partnership file for the district court case. The IRM states that "[t]his Form 886–Z(C) is the same one that was included in the FPAA package." *Id.*

However, the version of Form 886–Z(C) in the record was prepared before the DSIF's TMP filed the petition in district court. We cannot say why this version of the Form was generated. Moreover, we are not convinced that petitioners' interpretation of the "same one" language is correct because numerous parts of the IRM instruct RAs to update Form 886–Z(C) when they receive additional information about partners even after the IRS issued an FPAA. *See* IRM 4.29.2.2.2(3) (Jan. 1, 2003). It would be inconsistent for the IRM to require use of the same version of a Form and to require RAs to update the Form.[17] Neither party elicited testimony about the Form. Significantly, petitioners did not elicit testimony that contradicts our understanding that (1) Form 886–Z(C) may have been revised after the IRS mailed Bogan's notice partner FPAA and (2) it does not necessarily reflect the addresses in PCS or IDRS when the IRS mailed the notice partner FPAA.

---

[17] Nor do we agree with petitioners' position that Form 886–Z(C) is provided to the TMP as part of the TMP FPAA. *See* IRM 4.31.2.2.9.3(1)(G) (2004) (stating Form 886–Z(C) should be printed for case file only).

**[\*34]**  F.  *Validity of the Regulation*

Petitioners tersely assert that Temporary Treasury Regulation § 301.6223(c)-1T(f) is invalid.[18] The regulation provides that the IRS "may use other information in its possession" but it "is not obligated to search its records for information not expressly furnished" on the partnership return for the taxable year at issue or in accordance with the written statement requirement. *Id.*

Petitioners did not seriously challenge the validity of the regulations. They did not cite *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), and have not articulated a basis to challenge the efficacy of the regulation. Section 6223(c)(2) expressly delegates authority to the Secretary of the Treasury to promulgate regulations for furnishing updated partner and address information to the IRS. We find that the regulation is consistent with the statute and is valid.

Petitioners also argue that respondent's interpretation of the regulation is not permissible. We disagree. Respondent interprets the regulation in accordance with its plain, unambiguous meaning, that the IRS is not obligated to search its records for information not provided in accordance with the Code and the written statement requirement of the regulations. We find that the IRS satisfied the requirements of the Code and the regulations by mailing a copy of the notice partner FPAA to Bogan at the Schedule K–1 address.

II.  *Statute of Limitations*

Petitioners argue that the period of limitations expired before the IRS issued both the DSIF FPAA and the affected items Notices of Deficiency. They argue that the partnership and individual consents are invalid. They further argue that the decision document in *Blum I* caused the limitations period to expire for 1999. We disagree with petitioners and hold that respondent timely issued the affected items Notices of Deficiency.

---

[18] Petitioners argue that Treasury Regulation § 301.6223(c)-1(f) is invalid. However, that regulation was effective for partnership taxable years beginning on or after October 4, 2001. Accordingly, we treat petitioners as challenging the validity of Temporary Treasury Regulation § 301.6223(c)-1T(f), which was in effect for DSIF's 1999 taxable year. Both versions of the regulation contain nearly identical terms.

**[\*35]**  A.    *TMP Consents*

Partners cannot challenge the validity of the TMP consents in a partner-level case. The timeliness of an FPAA is a partnership item that must be raised during the TEFRA case, or it is waived. *Crowell*, 102 T.C. at 693; *Goldberg*, T.C. Memo. 2021-119, at \*11–12; *see* § 6221 (requiring partnership items to be determined at the partnership level). A challenge to the validity of a TMP consent "is precisely the type of challenge prohibited by TEFRA in light of Congress's decision that such suits are better addressed in one fell swoop at the 'partnership level' than in countless suits by individual partners."[19] *Kaplan v. United States*, 133 F.3d 469, 473 (7th Cir. 1998). Accordingly, we do not address the merits of petitioners' argument with respect to the TMP consents.[20]

B.    *Individual Consents*

Section 6501(a) sets a three-year limitations period from the filing of a return to assess tax. In the case of a tax imposed on partnership and affected items, section 6229 extends the period of limitations prescribed by section 6501(a). *Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner*, 114 T.C. 533, 545 (2000). Section 6229 prescribes a minimum three-year limitations period to assess tax attributable to partnership or affected items that supplements the section 6501(a) limitations period. *Rhone-Poulenc*, 114 T.C. at 540–42. Sections 6229 and 6501 provide alternative statutes of limitations. *Rhone-Poulenc*, 114 T.C. at 544; *see* § 6501(n)(2) (cross-referencing section 6229 for the extension of the limitations period for partnership items).

Under section 6229(a), the limitations period for assessing tax attributable to partnership or affected items is three years after the later of the filing of the partnership return or the last day for timely filing the return. The timely mailing of the TMP FPAA suspends the

---

[19] While the Tenth Circuit has not ruled on the issue of whether the period of limitations is a partnership item, every other circuit court that has considered the issue has held that it is a partnership item that must be litigated in the TEFRA partnership case. *See Bedrosian v. Commissioner*, 940 F.3d 467, 471–72 (9th Cir. 2019), *aff'g* 143 T.C. 83 (2014); *Keener v. United States*, 551 F.3d 1358, 1362–63 & n.3 (Fed. Cir. 2009); *Weiner v. United States*, 389 F.3d 152, 156 (5th Cir. 2004); *Davenport Recycling Assocs. v. Commissioner*, 220 F.3d 1255, 1260 (11th Cir. 2000), *aff'g* T.C. Memo. 1998-347; *Chimblo v. Commissioner*, 177 F.3d 119, 125 (2d Cir. 1999), *aff'g* T.C. Memo. 1997-535; *Williams v. United States*, 165 F.3d 30 (6th Cir. 1998) (per curiam) (unpublished table decision).

[20] Section 6226(d)(1)(B) permits individual partners to participate in a partnership case to raise a limitations period defense.

**[\*36]** running of the limitations period, and the limitations period remains suspended for the period during which a partnership case may be filed in court and, if an action is brought, until the court's decision has become final plus for one year thereafter. § 6229(d)(2). The TMP may agree to extend the section 6229(a) limitations period for tax attributable to partnership or affected items in a written agreement with the IRS, i.e., a TMP consent. §§ 6501(c)(4), 6229(b)(1). When a TMP agrees to extend the limitations period, he does so on behalf of all partners. Alternatively, an individual partner may agree to extend the limitations period for his share of partnership and affected items, i.e., an individual consent. An individual consent must expressly state that it applies to tax attributable to partnership or affected items. *See* § 6229(b)(3).

Petitioners may challenge the timeliness of the affected items Notices of Deficiency on the basis of the individual consents. Petitioners argue that the individual consents are invalid. However, we find that the individual consents are valid on their face, and petitioners did not present any evidence that the consents are invalid. *See Evert v. Commissioner*, T.C. Memo. 2022-48, at \*5–6 (placing the burden on taxpayers to affirmatively show that consents are not valid). Petitioners also argue that the individual consents failed to expressly extend the 1999 limitations period with respect to partnership or affected items and, as a result, the individual consents do not extend the 1999 limitations period. Petitioners' argument is of no avail. Petitioners' 1999 limitations period was open to assess tax attributable to partnership and affected items under section 6229, and thus, the individual consents are immaterial.

The district court's decision in the *63 SIFs* case became final on January 20, 2015, and respondent had one year from that date to issue the affected items Notices of Deficiency. Accordingly, the affected items Notices of Deficiency dated December 8, 2015, were timely under section 6229. The disallowed losses for 2007 and 2010 are carryovers of the 1999 BLIPS tax shelter loss. The limitation periods for 2007 and 2010 remain open for the carryover loss to the same extent as the 1999 limitations period. *See* § 6229.

C.     Blum I *Decision*

Petitioners argue that the *Blum I* Decision caused the limitations period to expire for 1999 because it did not expressly state that the period remained open for assessing tax attributable to partnership or

**[\*37]** affected items. They argue that our Court's decisions must reserve respondent's right to assess tax attributable to partnership or affected items. However, petitioners cite no statutory, regulatory, or judicial authority for this argument. Rather, they simply argue that our decisions routinely include such provisions. There is no requirement in the Code or the regulations that our decisions reserve a right for the Commissioner to assess tax for partnership or affected items. In accordance with our routine practice, the *Blum I* Decision states that "[i]t is further stipulated that this decision does not include adjustments subject to separate determination under . . . TEFRA partnership provisions." Furthermore, the *Blum I* Decision has no relevance to the limitations period issue because we had no jurisdiction in *Blum I* over the BLIPS adjustments.

## III. *Purported Settlement of DSIF Affected Items*

Petitioners argue that their tax liability attributable to the disallowance of the BLIPS tax shelter loss was resolved in *Blum I* and incorporated in the Rule 155 computation. They further argue that the December 2015 closing agreement and DSIF's account transcripts reflect the settlement and payment of the resulting tax.[21] We disagree with petitioners on all counts.

### A. *Improper Second Notice of Deficiency*

Petitioners argue that the 1999 affected items Notice of Deficiency is an improper second Notice of Deficiency for 1999 because 1999 was included in the 2005 Notice of Deficiency. They argue that in the 2005 Notice of Deficiency respondent determined that DSIF correctly reported all partnership items on its 1999 partnership return. Accordingly, they argue that their bases in the DSIF assets did not require adjustments to partnership items. These arguments are clearly incorrect. In the 2005 Notice of Deficiency respondent's deficiency determination included a deficiency attributable to Mr. Blum's sale of the DSIF assets. However, we dismiss that part of the deficiency determination from *Blum I*. Thus, *Blum I* did not resolve Mr. Blum's tax from the sale of the DSIF assets or his basis in the DSIF assets. We again point out that we did not have jurisdiction over the DSIF's partnership and affected items in *Blum I* and did not have jurisdiction to determine the amount of petitioners' deficiency attributable to the

---

[21] Respondent argues that we should not consider petitioners' closing agreement argument because they failed to affirmatively plead it. We find that petitioners have sufficiently pleaded this issue.

[*38] disallowance of the BLIPS tax shelter loss. Nor did we have jurisdiction to determine Mr. Blum's bases in the DSIF assets, which were affected items because he carried over Bogan's outside basis in DSIF as his bases in the distributed DSIF assets.

As we explained in *Bedrosian*, 143 T.C. at 108–09, it is common practice for the Commissioner to issue both an FPAA to a partnership and a Notice of Deficiency to a partner determining the same adjustments. Thus, issuance of the 2005 Notice of Deficiency was not a concession by respondent that the reporting on DSIF's partnership return was correct. Rather, the prior issuance of the FPAA is respondent's determination that TEFRA applies. *Id.* Accordingly, the 1999 Notice is not a second Notice of Deficiency.

Petitioners argue that the $373,641 deficiency determined in *Blum I* is mathematically impossible unless it incorporated a settlement of the BLIPS tax shelter loss. They argue that *Blum I* would have resulted in a deficiency of only $8,701 for 1999 in the absence of the resolution of the BLIPS adjustments. Thus, the agreed computation must have included a settlement of the BLIPS tax shelter adjustments.[22]

A simple review of the filings in *Blum I* shows that petitioners' argument is completely without merit. The 2005 Notice of Deficiency clearly shows that respondent disallowed a $1,754,670 capital loss from the OPIS equity swap for 1999. In *Blum I* the Court explained that on their 1999 return petitioners reported a $1,754,670 capital loss from the OPIS equity swap, which we disallowed. *Blum I*, T.C. Memo. 2012-16, slip op. at 19. The agreed computation in *Blum I* shows that the 1999 deficiency is in part attributable to a $1,754,670 adjustment for the OPIS swap. The $373,641 deficiency determined in the *Blum I* Decision clearly relates to the OPIS tax shelter and in no way forecloses respondent from making the BLIPS adjustments determined in the affected items Notices of Deficiency.

Respondent prepared a Rule 155 computation using a *Munro* computation to determine petitioners' 1999 tax deficiency solely on the basis of *Blum I* without accounting for the potential disallowance of the

_____

[22] Petitioners did not propose any findings of fact to establish how they computed the $8,701 amount or cite any evidence or authority to support the computation. Rather, they cited a Declaration and attached Exhibit that we excluded from evidence. *See* Order, May 16, 2024. In that Order we advised petitioners to present the computations and the authorities that support their analysis in their Posttrial Briefs, which they failed to do.

[*39] BLIPS tax shelter loss. A *Munro* computation is used to separate tax attributable to nonpartnership items from tax attributable to partnership and affected items. *Munro* computations are performed when a return is oversheltered (the return reports no taxable income and a net loss from a partnership) and the nonpartnership adjustments result in a deficiency. *See* § 6234(a)(2) and (3); *see also* § 6234(b) (defining an oversheltered return). Petitioners filed an oversheltered return for 1999, and the nonpartnership adjustments determined in *Blum I* resulted in a deficiency. The *Munro* computation determined that there was a deficiency of $373,641, without accounting for the disallowance of the BLIPS tax shelter loss or other BLIPS adjustments. It was appropriate for respondent to use a *Munro* computation because the IRS could not yet assess the tax attributable to the BLIPS adjustments because the *63 SIFs* case was still ongoing.

Moreover, as we stated above, the *Blum I* Decision expressly stated that "this decision does not include adjustments subject to separate determination under . . . TEFRA." The clear meaning of this statement is that the 1999 deficiency determined in *Blum I* did not include the BLIPS adjustments. Nevertheless, petitioners seek to explain away this statement in the *Blum I* Decision with a nonsensical argument that it refers to another unrelated TEFRA entity, ThinkTank.com, LLC (ThinkTank), that Mr. Blum owned through a trust. Petitioners did not propose any findings of fact relating to ThinkTank in their Briefs or submit any relevant evidence at trial likely because there is none. Petitioners do not explain how the issue relating to ThinkTank remained unresolved when the *Blum I* Decision was filed in 2012. The parties signed the agreement in January 2005, before respondent issued the 2005 Notice of Deficiency. The agreement appears to relate to ThinkTank's 2000 taxable year. Petitioners have not explained how ThinkTank's activities affected their 1999 tax liability, and there is no evidence in the record that the agreement affected their 1999 tax liability. We see no adjustment relating to ThinkTank in the 2005 Notice of Deficiency or the opinion in *Blum I*. Moreover, the record suggests that petitioners accounted for the agreement's effect on their capital loss carryover in 2005. Once again, petitioners' argument lacks merit.

B.     *Closing Agreement*

We also reject petitioners' argument that the December 2015 closing agreement establishes that *Blum I* resolved their 1999 tax liability from the BLIPS tax shelter. The closing agreement clearly

**[\*40]** relates solely to interest abatement on the deficiencies determined in *Blum I*. Moreover, RA Gee credibly testified that it was not the type of closing agreement used for the BLIPS investors who accepted the settlement initiative.

Section 7121(a) authorizes the Commissioner to enter into closing agreements with taxpayers to resolve their tax liabilities. Once approved by the IRS, closing agreements are final and conclusive absent a showing of fraud, malfeasance, or misrepresentation of a material fact. § 7121(b). While closing agreements are similar in some respects to traditional contracts, their validity and enforceability are governed by the Code. *Rink v. Commissioner*, 100 T.C. 319, 325 n.4 (1993), *aff'd*, 47 F.3d 168 (6th Cir. 1995); *see Urbano v. Commissioner*, 122 T.C. 384, 393 (2004) (stating that section 7121 is the exclusive means by which a closing agreement may be accorded finality). A closing agreement is binding on the parties "as to the matters agreed upon." § 7121(b)(1). We may not read into it any matters not specifically agreed upon and mentioned in the closing agreement. *See Zaentz v. Commissioner*, 90 T.C. 753, 766 (1988). Courts strictly construe closing agreements to encompass only the issues enumerated in the closing agreement itself. *Analog Devices, Inc. & Subs. v. Commissioner*, 147 T.C. 429, 445–46 (2016); *Hopkins v. Commissioner*, 120 T.C. 451, 457 (2003).

Closing agreements are subject to the rules of federal common law contract interpretation. *Analog Devices*, 147 T.C. at 446. We construe a closing agreement according to the parties' intent when they entered into it. *Long v. Commissioner*, 93 T.C. 5, 10 (1989), *aff'd*, 916 F.2d 721 (11th Cir. 1990) (unpublished table decision). Intent is inferred from the four corners of the closing agreement when the contract is unambiguous although we may use extrinsic evidence to discern the parties' intent when the closing agreement is ambiguous. *Rink*, 100 T.C. at 325. Contracts must be read as a whole and interpreted in context. *See Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 439–40 (1st Cir. 2013). Although recital clauses are not binding, they are explanatory and can give insight into the parties' intent. *See Estate of Magarian v. Commissioner*, 97 T.C. 1, 5 (1991); *Zaentz*, 90 T.C. at 762.

The December 2015 closing agreement is unambiguous. It is clear from reading the closing agreement that the parties entered it to resolve a dispute over interest on petitioners' tax liability determined in *Blum I*. The recitals provide that the closing agreement's subject matter was partial abatement of accrued interest. The dispute over the interest arose because criminal investigations of the BLIPS tax shelter

[*41] promoters delayed resolution of *Blum I*. The closing agreement states that petitioners alleged that they agreed to extend the limitations period because RA Politzer told them that they qualified for suspension of interest. This statement was correct when RA Politzer allegedly made it, but Congress later eliminated the suspension provision retroactively. The closing agreement states that Appeals agreed to abate interest on the basis of the hazards of litigation and "a compelling issue of fairness." There is no discussion in the closing agreement of petitioners' tax attributable to the BLIPS tax shelter.

Petitioners rely on a statement in the closing agreement that they "have full paid the balance of the liability." That statement must be read in the context of the closing agreement as a whole. When we do so, it is clear that the statement refers to the tax assessed as a result of the *Blum I* Decision, not tax attributable to the BLIPS adjustments which had not yet been assessed when the closing agreement was executed. The "full paid" statement was included in the closing agreement to establish that petitioners were entitled to withdrawal of the NFTL for 1998 and 1999. During the CDP hearing the SO told petitioners that the IRS would withdraw the NFTL once they "full paid" their assessed tax liability.

While we find the closing agreement unambiguous, if we were to consider extrinsic evidence, we would find that it strongly confirms that the closing agreement did not settle the BLIPS adjustments. During the CDP hearing petitioners argued for interest abatement relating only to their liabilities determined in *Blum I*. Petitioners signed a summary notice of determination that stated that "another liability is expected to be assessed" for 1999, i.e., tax relating to the BLIPS tax shelter. The SO wrote in his case activity file that petitioners represented that they "don't know when Exam is going to make the TEFRA assessment for the BLIPS shelter." Less than three months after signing the closing agreement, petitioners, using the same attorney, filed the Petition challenging the BLIPS adjustments but did not assert in the Petition that the BLIPS adjustments had been settled. The attorney testified at trial and did not confirm that petitioners' newly crafted interpretation of the closing agreement is in line with their intent when they entered into the closing agreement.

C.    *IRS Transcripts*

Petitioners argue that two account transcripts for DSIF, BMFOLZ and BMFOLV, show that they have settled their 1999 tax

[*42] liability attributable to DSIF.[23] A BMFOLZ transcript provides information relating to a taxpayer's audit history, and a BMFOLV transcript provides information from the IRS's retention register for a taxpayer's prior audits. IRM 2.3.59.6(1) (July 1, 2019). These computer-generated transcripts provide information in the IRS's official computer records using transaction codes and document locator numbers. *Id.*

DSIF's BMFOLZ transcript shows an $898,928 assessment. This amount corresponds to the $373,641 deficiency and the $66,619 penalty determined in *Blum I* plus interest that accrued before petitioners paid the amount owed in August 2014. Petitioners' personal transcripts confirm assessments of these amounts in September 2012, which corresponds to the *Blum I* Decision. We understand that DSIF's BMFOLZ transcript shows petitioners' liability for adjustments unrelated to DSIF and the BLIPS adjustments. Petitioners did not offer any evidence to interpret the codes on the transcript in a manner that aids their case.[24]

DSIF's BMFOLV transcript shows that the IRS audited DSIF's return for the 1999 taxable year and that the IRS removed the records relating to the audit from its active business master file (BMF) to its recoverable retention register (RRR) in 2014. The IRS moves taxpayer records for older, inactive tax periods to the RRR, but the records can be restored to active status if they are needed. *See* IRM 4.4.23.8.1 (Aug. 7, 2013). The files in the RRR are less accessible but can be returned to active status in the BMF if they are needed. The 2014 removal of DSIF's files to the RRR coincides with the district court's 2014 order granting summary judgment to the Government in the *63 SIFs* case. There is no indication or evidence that removal of DSIF's files to the RRR means that petitioners settled their tax liability attributable to the BLIPS tax shelter. It makes sense to us that the IRS moved DSIF's records to the RRR when the *63 SIFs* case ended because partnership-level records are not generally required to make affected item adjustments at the partner level.

---

[23] BMFOL is an acronym for Business Master File On-Line.

[24] At the beginning of trial, we stated that it was important for the parties to introduce evidence to explain the meaning of the codes and numbers in any transcript that they intended to rely on. *See Barnes v. Commissioner*, T.C. Memo. 2010-30, slip op. at 10–11 ("Many of the documents in the administrative file and most of the documents labeled as transcripts of [the taxpayer's] account are full of abbreviations, alphanumeric codes, dates, and digits that are indecipherable and unintelligible without additional explanation.").

**[\*43]** Petitioners' arguments relating to the transcripts are mere conjecture that is contrary to the facts in the record. Petitioners failed to solicit evidence to support a different understanding of BMFOLZ and BMFOLV transcripts. Neither transcript reflects a settlement or an assessment of tax attributable to the BLIPS tax shelter. Rather, the BMFOLZ transcript reflects the assessments for the tax, penalty, and accrued interest from the issues decided in *Blum I*. Clearly, respondent did not settle petitioners' BLIPS adjustments for 2.5% ($373,641) of the deficiency determination ($15 million) as petitioners allege, especially given that the settlement initiative required BLIPS investors to concede 100% of the tax.

IV.    *Propriety of Basis Adjustment*

Petitioners argue that respondent cannot adjust their bases in the DSIF assets in this affected items case. They argue that such an adjustment required a determination that DSIF was a sham, but the district court did not determine that DSIF was a sham. We disagree. It was unnecessary for the district court to sham DSIF for respondent to adjust Mr. Blum's bases in the DSIF assets. As part of the BLIPS tax shelter, Mr. Blum artificially inflated Bogan's outside basis in DSIF on the basis of the BLIPS transactions. The district court determined that the BLIPS transactions lacked economic substance and were disregarded for federal tax purposes. That is enough for respondent to adjust Bogan's outside basis in DSIF to zero. Moreover, nowhere in the 1999 affected items Notice of Deficiency did respondent state that he made the determinations on a holding by the district court that DSIF was a sham. The word "sham" is not in the 1999 affected items Notice of Deficiency.

Petitioners carried over Bogan's outside basis in DSIF as their bases in the DSIF assets. In general a partner's basis in an asset that he receives in a liquidating distribution from a TEFRA partnership is an affected item. *Domulewicz v. Commissioner*, 129 T.C. 11, 20 (2007), *aff'd in part, remanded in part on other grounds sub nom. Desmet v. Commissioner*, 581 F.3d 297 (6th Cir. 2009); *see also* § 6231(a)(5) (defining an affected item). When a partner's outside basis is greater than the partnership's basis in the distributed asset, the partner's basis in the distributed asset (other than money) is the partner's outside basis in his partnership interest. § 732(b); Treas. Reg. § 1.732-1(b); *see* § 732(c) (providing rules for the allocation of outside basis among the distributed assets); *see also* § 6231(a)(3) (defining a partnership item). Petitioners determined Bogan's outside basis in DSIF through the BLIPS

**[\*44]** transactions that the district court held lacked economic substance and were disregarded for federal tax purposes, meaning that Bogan cannot increase outside basis by those transactions.

In the 1999 affected items Notice of Deficiency respondent adjusted petitioners' bases in the DSIF assets to zero and disallowed petitioners' reported loss on the sale of the DSIF assets. Respondent's adjustment of the bases of the DSIF assets to zero is correct under the Code and the district court's decision. A partner's outside basis in his partnership interest is an affected item. *Woods*, 571 U.S. at 42. A partner-level proceeding is required even if the partner-level determinations do not affect the partner's tax attributable to the partnership and affected items. *Estate of Keeter v. Commissioner*, T.C. Memo. 2018-191, at \*14, *aff'd*, 75 F.4th 1268 (11th Cir. 2023). Partner-level determinations are required when the partner disposes of the distributed assets including the partner's holding periods of the assets, the character of the gain or loss, and whether the assets that the partner sold were in fact the assets that he received from the partnership. *Domulewicz*, 129 T.C. at 20.

However, certain components of a partner's outside basis must be determined at the partnership level, including partnership liabilities and partnership distributions. *Greenwald v. Commissioner*, 142 T.C. 308, 315–16 (2014); Treas. Reg. § 301.6231(a)(3)-1(a)(1)(v), (4). The factual and legal determinations made at the partnership level with respect to these components of outside bases are conclusive at the partner level. *See* Treas. Reg. § 301.6231(a)(3)-1(a) (categorizing the amount and character of partnership liabilities as a partnership item).

In the 1999 affected items Notice of Deficiency respondent determined that Mr. Blum had zero basis in each DSIF asset. In the *63 SIFs* case the district court determined that the BLIPS transactions were shams and lacked economic substance. Thus, the transactions could not generate Bogan's outside basis in DSIF. Petitioners did not provide any evidence that challenged respondent's determined deficiency for 1999, 2007, or 2010. Accordingly, we sustain respondent's deficiency determination for each year at issue.

V.    *Estoppel*

In their Opening Brief petitioners argue for the application of judicial estoppel, and in their Answer Brief they argue for collateral estoppel.

**[\*45]** A.    *Judicial Estoppel*

Judicial estoppel prevents a party from asserting a position that is contrary to one that it took in a prior case and affirmatively persuaded a court to accept. *Huddleston v. Commissioner*, 100 T.C. 17, 26 (1993). It seeks to protect the integrity of the judicial process. *Id.* Generally, three nonexhaustive factors guide our analysis when we are asked to invoke this doctrine: whether (1) the party's later position is clearly inconsistent with its earlier position, (2) the party persuaded a court to accept its earlier position, and (3) the party seeking to assert an inconsistent position would derive an unfair advantage. *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001).

Petitioners argue that we should judicially estop respondent from arguing that the district court's decision is controlling. They argue that the district court's decision is not binding on them because they were not parties to the *63 SIFs* case, seemingly forgetting that a petition was filed in district court on DSIF's behalf and the certificate of interested entities named both DSIF and Mr. Blum. Under the Code, Mr. Blum was a party to the *63 SIFs* case. *See* § 6226(c), (d)(1)(B).

Petitioners seem to argue that they settled their case and were not part of the *63 SIFs* case. They argue that a statement the Government's counsel made in the district court case that "virtually all the investors had settled BLIPS" somehow proves that they settled the BLIPS adjustments. Petitioners have not proved that they settled their case.[25] There are no grounds to apply judicial estoppel against respondent.

B.    *Collateral Estoppel*

Collateral estoppel is a judicially created doctrine that is intended "to protect litigants from the burden of relitigating an identical issue and to promote judicial economy by preventing unnecessary or redundant litigation." *See Hambrick v. Commissioner*, 118 T.C. 348, 351 (2002). It bars the relitigation of an issue of law or fact that has been decided by a court in a previous case. *Stan Lee Media, Inc. v. Walt Disney Co.*, 774 F.3d 1292, 1297 (10th Cir. 2014); *see also Keller Tank Servs. II, Inc. v. Commissioner*, 854 F.3d 1178, 1193 (10th Cir. 2017). It ensures

---

[25] Petitioners also erroneously refer to DOJ's attorneys representing the Government in the *63 SIFs* case as respondent's counsel.

**[\*46]** the finality of decisions and prevents inefficient use of judicial resources. *See Montana v. United State*s, 440 U.S. 147, 153–54 (1979).

The elements of collateral estoppel are (1) an issue that is identical to an issue decided in the first suit; (2) a final judgment rendered by a court of competent jurisdiction; (3) the same party, or a privy to a party, in the first suit; (4) actual litigation and resolution of the issue which was essential to the judgment in the prior decision; and (5) unchanged controlling facts and applicable legal rules. *Hambrick*, 118 T.C. at 353–54; *see Peck v. Commissioner*, 90 T.C. 162, 166–67 (1988), *aff'd*, 904 F.2d 525 (9th Cir. 1990).

Petitioners argue that the doctrine of collateral estoppel prevents respondent from adjusting Mr. Blum's bases in the DSIF assets because the assets' bases were actually litigated in *Blum I*. They argue that we did not lose jurisdiction over Mr. Blum's bases in the DSIF assets in *Blum I*. They argue that the adjustments to Mr. Blum's bases in the DSIF assets did not require partnership-level determinations. Petitioners show a fundamental misunderstanding of the law. They appear to argue that Mr. Blum's bases in the distributed DSIF assets are not partnership or affected items. Again, they cite no authority for this position. It is well settled that outside basis is an affected item that must be determined at the partner level. *Woods*, 571 U.S. at 42. We have rejected petitioners' arguments above and will not address them again.

VI.    *Additions to Tax and Penalties*

A.    *Section 6651(a)(1) Untimely Filing Addition to Tax*

Section 6651(a)(1) imposes an addition to tax of 5% of the tax required to be shown on a return for each month for which there is a failure to file a tax return, up to 25% in the aggregate, unless the taxpayer proves that the failure was due to reasonable cause and not due to willful neglect. Treas. Reg. § 301.6651-1(c). Willful neglect is defined as a "conscious, intentional failure or reckless indifference." *United States v. Boyle*, 469 U.S. 241, 245 (1985). Reasonable cause exists where the taxpayer exercised ordinary care and prudence but was nevertheless unable to file the return by the due date. *Id.* at 246.

Respondent determined a section 6651(a)(1) addition to tax for 2007. Petitioners' 2007 return was due under extension on October 15, 2008, and they filed it on November 3, 2008. Petitioners assert that although they resided in Wyoming when the 2007 return was due under extension, wildfires in California delayed its filing. There is no evidence

**[\*47]** in the record that fires in another state delayed filing of petitioners' 2007 return. We find that petitioners have not established reasonable cause for their untimely filing and are liable for the section 6651(a)(1) addition to tax for 2007.

B.    *Section 6662(h) Gross Valuation Misstatement Penalty*

Section 6662(h) imposes a 40% penalty for a gross valuation misstatement. Respondent previously determined that the section 6662(h) penalty applied to DSIF at the partnership level in the FPAA issued for DSIF. The district court in the *63 SIFs* case agreed that the penalty provisionally applied. Respondent determined a section 6662(h) penalty on the tax attributable to the disallowance of the BLIPS tax shelter loss for each year at issue in the affected items Notices of Deficiency. Respondent has moved to strike and dismiss the penalties on the ground that they are not affected items subject to the deficiency procedures as they were determined to apply in the *63 SIFs* case.

The deficiency procedures do not apply to the assertion of penalties that relate to adjustments to partnership items. § 6230(a)(2)(A)(i); *Highpoint Tower Tech. Inc. v. Commissioner*, 931 F.3d 1050 (11th Cir. 2019); *Domulewicz*, 129 T.C. at 22–23. Accordingly, we do not have jurisdiction over the section 6662(h) penalties and will dismiss them.

Petitioners argue that the section 6662(h) penalties should not be treated as computational adjustments that are not subject to deficiency procedures in this case because respondent did not issue them a Notice of Computational Adjustment for the penalties. Petitioners argue that as a result they will not be able to challenge the penalties in a refund suit.[26] Irrespective of petitioners' concerns, we do not have jurisdiction to consider the section 6662(h) penalties. *See* § 6214(b); *Sente Inv. Club P'ship of Utah v. Commissioner*, 95 T.C. 243, 248–50 (1990); *Maxwell v. Commissioner*, 87 T.C. 783, 788 (1986). The effect of respondent's failure to include the section 6662(h) penalties attributable to the BLIPS tax shelter adjustments in a Notice of Computational Adjustment is not for us to resolve.

---

[26] The Notice of Computational Adjustment for 1999 did not include a section 6662(h) penalty attributable to the disallowance of the BLIPS tax shelter loss. There is no Notice of Computational Adjustment for 2007 or 2010 in the record.

**[*48]** In reaching our holdings, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered for respondent except that the section 6662(h) penalties will be dismissed by order.*